LAWRENCE *v.* INGERSOLL.

(*Knoxville.*     October  19,  1889.)

1. INJUNCTION.  *Inhibiting meeting of Board of Education.*

   Member of Board of Education, wrongfully excluded by his fellows
   from participation in the proceedings of such Board, may obtain in-
   junction against their meeting and acting as a Board without giving
   him notice and opportunity to be present.

2. ELECTIONS.  *Validity of open to inquiry, when.*

   Validity of an election to office may be contested and inquired into, in
   any proceeding by mandamus or otherwise, whereby the claimant
   seeks to compel others to admit his right and title to the office; es-
   pecially where no other means of contest are provided by law.

   Cases cited and approved: Marshall *v.* Kerns, 2 Swan, 67, 68; Pucket
   *v.* Bean, 11 Heis., 600; Lewis *v.* Watkins, 3 Lea, 181, 182.

3. SAME.  *By municipal authorities, how made.  Blank ballot.*

   In elections by Boards of Mayor and Aldermen, or other definite body
   of electors, the rule is, in the absence of statutory provision to the
   contrary, that a majority of those present and acting—there being a
   quorum—must concur in voting *for* a candidate in order to elect him;
   and those voting blank ballots are to be counted as present and not
   concurring.

4. SAME.  *Case in judgment.*

   Board of Mayor and Aldermen had authority to fill an office, voting by
   ballot.  That Board consisted of a Mayor and nine Aldermen.  A
   majority constituted a quorum for transaction of business.  The
   Mayor had no vote except in case of a tie.  At an election held to
   fill said office—there being present the Mayor and eight Aldermen
   —four votes were cast for L., three for F., and one blank ballot.
   The Mayor declared L. elected.  Upon motion to reconsider there
   were four votes for and four against reconsideration.  The Mayor,
   without casting his vote, declared the motion lost.  The Recorder
   issued certificate of election to L.

   *Held:* That L. was not elected, nor entitled to recognition as such officer.

Lawrence v. Ingersoll.

5. SAME. *Same. Mayor's action ineffectual.*

The Mayor's action, in declaring L. elected and the motion to reconsider the election lost, was wholly ineffectual. In neither case did he actually cast his vote. He could not have voted in an election effectually except by ballot. There was no tie in the first instance.

6. SAME. *Same. Issuance of certificate.*

Issuance of certificate of election to L. upon the assumption that he was elected, being wholly unauthorized, gave no protection to L.'s claim to the office.

7. SAME. *Same. Ratification.*

Refusal of Board to reconsider the election cannot be invoked in aid of L.'s claim to the office. The vote was not by ballot. A majority did not concur.

## FROM KNOX.

Appeal from Chancery Court of Knox County. H. R. GIBSON, Ch.

TAYLOR & HOOD and WAT. M. COCKE for Lawrence.

J. W. CALDWELL and INGERSOLL & PEYTON for Ingersoll.

SNODGRASS, J. The bill in this cause was filed by J. C. Lawrence, claiming to be a duly elected and qualified member of the Board of Education of the city of Knoxville, for an injunction against defendants—the other four members of said Board—

to prohibit the meeting and action of said Board without him, and to compel defendants, by mandamus, to recognize him as a member of the Board, and permit him to take part in its proceedings upon allegation of refusal of defendants so to do.

The injunction issued, and, on final hearing, mandamus was awarded as prayed for.

Respondents appealed and assigned errors.

Two preliminary questions are made, which need to be briefly noticed before disposition of the real merits of the controversy. One of these is made by respondents, and is an objection to the power of the Court to issue a mandatory injunction, upon the assumption that the one issued in this case is such. The other question is made by complainant, and goes to the right of the Court to inquire into the legality and validity of his election in this proceeding.

Respecting the first question, it is sufficient to say that the injunction is not mandatory. The injunction prohibited the meeting and acting of defendants without giving complainant notice, and permitting him to act with them. It did not command his admission except the respondents proceeded to act. It prohibited their acting, but authorized them to avoid this prohibition on compliance with conditions which they could or could not accept as they saw proper, and was clearly not mandatory. It therefore becomes irrelevant and unimportant to discuss the question of the

right to issue mandatory injunctions, and the extent to which they may go.

As to the second question stated, it is equally clear that the Chancellor had the right to determine the legality and validity of the election under which complainant claimed title to the office for the exercise of the powers of which he sought the aid of the Court. His election depended alone upon the action of the Board of Mayor and Aldermen, as embodied in the record made of it by them. The notification called a certificate, issued to him by the Recorder, is of no force or validity, because not required by law. But if it were, it could only embody the result of the record of election, and could not add to its efficacy in the least, or change its effect.

All the provision made in the charter of Knoxville respecting this election, pertinent to the point now being considered, is that it shall be made by the Mayor and Aldermen by ballot. No other official is, in terms, directed to declare it or to certify it, nor is any provision made for a contest.

In such case it is well settled that the legality and validity of such election may be inquired into in any proceeding by mandamus to compel other persons to recognize the claimant's title to the office, or when he seeks to enter into it or otherwise assert his right to act as duly elected. 6 American and English Encyclopedia of Law, 384, 385, and cases cited; *Marshall* v. *Kerns*, 2 Swan,

67, 68; *Pucket* v. *Bean*, 11 Heis., 600; *Lewis* v. *Watkins*, 3 Lea, 181, 182.

These questions out of the way, we come to the real question in the case. Was the complainant elected, and is he, therefore, entitled to compel the defendants to admit and recognize him as a member of the Board?

To determine this it is necessary to examine his claim to election, and then ascertain if, under the law, it is well founded. To support the first, he shows the following record from the minutes of the proceedings of the Board of Mayor and Aldermen, in addition to the notification or certificate of the Recorder, before referred to, and indorsement thereon of the Recorder that complainant had taken the oath required by law:

"At a called meeting of the Board of Mayor and Aldermen of the city of Knoxville, held Friday, January 27, A.D. 1888, there were present and answering roll-call: Aldermen Selby, Barry, Hockinjos, Jones, Albers, Horne, Perry, and McDaniel. Mayor Luttrell called Mayor-elect Condon and ex-Mayor Fulcher and Alderman S. B. Boyd to take seats on Mayor's stand. The following proceedings were had—to wit:

"The minutes of the meetings of this Board of January 6, January 25, and January 26 were read and approved.

"On motion of Alderman Albers, the Board took a recess of five minutes. Mayor Luttrell resumed the chair and called the Board to order. Alder-

man Perry moved to go into an election for a member of the City School Board to fill out the unexpired term of Hon. M. J. Condon, resigned. Motion carried.

" Mayor Luttrell appointed Aldermen McDaniel and Barry as tellers, and Alderman Perry to take up the vote.

"Alderman Perry nominated F. L. Fisher. Alderman Jones nominated Mr. J. C. Lawrence. The ballot was taken, and it was found that J. C. Lawrence had received four votes and F. L. Fisher three votes; and a blank was also found without any name, and thrown out.

" Mayor Luttrell declared J. C. Lawrence legally elected as a member of the City School Board of Education to fill out the unexpired term of Hon. M. J. Condon, resigned. Some discussion was had, after which Alderman Perry moved to reconsider said vote and election. Seconded by Alderman Albers.

" The ayes and noes were taken on roll-call. Aldermen Selby, Hockinjos, Albers, and Perry voting aye, and Aldermen Barry, Jones, Horne, and McDaniel voting no.

" Mayor Luttrell decided the motion lost.

" On motion of Alderman Barry the Board adjourned till 9 o'clock to-morrow morning.

" (Signed)     Approved:

JAS. C. LUTTRELL, *Mayor*."

" CITY OF KNOXVILLE, TENN.,

"January 31, A.D. 1888.

" *Mr. J. C. Lawrence:*

"At the regular meeting of the Board of Mayor and Aldermen of the City of Knoxville, held January 27, A.D. 1888, you were chosen and elected as a member of Board of Education, to fill out the unexpired term of said office of Martin J. Condon, resigned.

" By order of the Board,

" C. C. NELSON, *Recorder.*"

" Enrolled 1, 12 '89.    Bk. I., p. 45.

" J. C. Lawrence came before me and took oath of office, as required by new charter, January 31, 1888.

" C. C. NELSON, *Recorder.*"

Upon this record and these statements of the Recorder, he bases his claim to the office and right to a peremptory mandamus.

No question is made that the oath stated to have been taken is not *shown* to have been done by this indorsement, nor upon the notification or certificate as such. The question is only made, as to the latter, that the Recorder had nothing to do with the election or certifying it, and that this certificate does not affect the question; and this is true.

This brings us to the second subdivision of the real question—that is, to determine whether, under the law, he was in fact elected. The provisions

of the charter in relation to the election are found in several sections of the Act of June 10, 1885, entitled "An Act to reduce the acts incorporating the city of Knoxville, and the various amendments thereto, to one act, and to amend the same."

Section 63 of this Act provides that there shall be a Board of Education for the city, to consist of five members, citizens of the town, and not members of the Board of Mayor and Aldermen.

"Section 64. The Board of Education shall be elected by the Board of Mayor and Aldermen from the citizens and qualified voters of the town by ballot, and the term of office of each member shall be five years.

"Section 3. * * * The Board of Mayor and Aldermen shall be composed of nine Aldermen.

"Section 4. * * * The Mayor shall not vote, except in case there shall be a tie vote, on any question, and then he shall, by his vote, decide the question. * * *

"Section 5. It shall require a majority of the members of the Board to form a quorum for the transaction of business."

No provision being made for the filling of vacancies in the Board of Education, this defect was remedied by an ordinance, as follows:

"In case any vacancy shall occur in the Board of Education, the unexpired term of such member vacating shall be filled by an election by the Board of Mayor and Aldermen as soon as practicable after such vacancy occurs."

These are all the provisions of the charter or ordinances of the city necessary to be noticed. They are those under which the election was held, and the provisions of which must determine its validity or invalidity, no other law existing in our statutes which affects the question.

It is observed that there are nine Aldermen, who, with the Mayor, are to make the election, if all are present, the Mayor having no vote, as no tie could result; that if less than nine are present, but a majority of that number, then those present may elect; but, if equally divided in an election, the Mayor may cast the deciding vote, the only contingency in which his act can affect the question.

In the election now being considered a majority (eight) were present and participating in the election. This appears both in the *recitals* of the record hereinbefore shown and in the fact that seven ballots were cast for the candidates and one blank ballot.

It remains now to inquire what is the effect of this action on the part of this Board acting through its eight members, an authorized quorum.

In determining this question it must be borne in mind that we are not examining the effect of an election by an indefinite number of electors—as, the vote of the body of the people of the city, or the vote of any indefinite number of people in a popular election—for the rule governing the one is entirely different from that governing the other.

In the case of a general or special election by the vote of the people, by the vote of an indefinite number, the common law rule is that a plurality of votes elects—that is, the candidate getting more votes than any other is elected, although he does not get a majority of the votes cast, and hence it makes no difference that there are absent voters or blank votes cast. They do not change the fact that one candidate receives a plurality, and cannot do so in the very nature of things. Cooley on Const. Limitations, Sec. 779, 5th Ed. See also Secs. 770, 771.

Mr. Cooley treats alone the subject of popular elections, the scope of his work not including elections by governing bodies of corporations.

This is not only the rule at common law, but it is so by statute in this State; and hence in our elections by the people the candidate who gets the highest number of votes is elected.

And this rule is applied to corporate action where the corporate power resides in the inhabitants or citizens at large, and where they meet and act in their primary capacity—and hence in indefinite numbers. Dillon on Munic. Corp., Secs. 208–215.

But the rule is equally well settled, and indeed is not open to controversy, that where an election is to be made by a definite body of electors, as a number of Aldermen, that, "in the absence of special provision, the *major part of those present* at a meeting of this select body must *concur* in order

to do any valid act." Dillon on Munic. Corp., Vol. I., Secs. 216, 220.

"Where, therefore," adds the author, "it appeared that thirteen ballots were cast when the members present were only entitled to give twelve votes, of which seven were for one person and six for another, there is no election, and the council, though it has declared that the person receiving seven votes was duly elected, may rescind its action and proceed to a new election." *Ibid.*

And this common law rule as to majorities, he declares, is applied to governing bodies of municipal corporations where not specially regulated by charter or statutes. Secs. 216, 217.

We have seen that it is not only not differently regulated by the charter of Knoxville or other statute of Tennessee, but that the charter provides for the transaction of business only by a majority of a quorum, and gives the Mayor a right to vote when the majority thereof cannot decide, thereby conclusively showing that a majority must *concur,* or there is no result. A different rule, as we have seen, and we repeat, prevails at common law where the election is by an indefinite number of electors, in which a plurality of votes is sufficient for an election.

These rules and their distinctions are very forcibly and clearly stated in the able treatise on elections in the sixth volume of American and English Encyclopedia of Law, as follows: "The only way to defeat the election of a candidate at an

election where the number of the electors is indefinite, or where the law does not require a majority of all the members of a body having a definite number (as opposed to a majority of those voting), is by voting for another candidate; and the fact that a majority enters a protest against the minority candidate voted for at a regularly called election will not defeat the election if no other candidate is voted for.

" This rule does not apply to cases where the elective body consists of a definite number and a majority of the members is required for an election. In such case a refusal to vote, or a blank vote by a majority, will defeat an election." Pages 331, 322.

We have heretofore seen that under this charter a majority of the quorum is required. This author shows, further, that the rule respecting the election by a definite number in a municipal body extends also to other bodies of definite numbers, as Legislatures, etc., and shows that in such case a majority must concur and vote *for* the candidate in order to elect him, quoting several cases and instances of high authority. He says, illustrating :

" By Section 15 of the Revised Statutes of the United States, it is provided that all votes for Senators shall be by *viva voce* vote of members of the Legislature, and by Section 37, that all votes for representatives in Congress must be written or printed ballots, and that all votes received or recorded contrary to such action shall be of no effect.

It has been held that where there is no provision of law making a plurality sufficient for an election, that a majority of the votes cast must be for a candidate in order to elect him." *Ibid.*, 332, citing 32 Cong., 45, *State* v. *Hogan.*

He cites several cases sustaining the text, the notes being as follows:

"In the absence of any Act of Congress on the subject, a State may pass a law, or a joint or concurrent resolution of the Legislature, requiring a majority of all the members elected to both branches of the Legislature to elect a Senator of the United States; and in such a case, where twenty-nine votes were given for one candidate and twenty-nine blank votes were given, it was held that this did not constitute an election. Second Cong. El. Cases, 608; *Yules* v. *Mallory*, Sen. El. Cases, 146." And again: "In 1866, in the Stockton case in New Jersey (Senate Election Cases 264), it appeared that there was no law in the State regulating the election of Senators; and there had been a practice of regulating the election of all officers by resolution of the convention, and at the convention for the election of Senators in 1865 a resolution was adopted that a plurality of the members present might elect. The Judiciary Committee, reporting through Senator Trumbull, decided in favor of the validity of the election, but the resolution was amended by the close vote of 22 to 21, and the candidate was declared not · elected. It was claimed by some of the Senators that the parliamentary law required a

majority to elect, and this could only be changed by a law or a resolution of the houses acting in their legislative capacity." *Ibid.*, 332.

Thus it appears, by concurrence of text-book, judicial, senatorial, congressional, and legislative authority, that the rule is settled that a majority of a definite body present and acting must vote *for* a candidate in order to elect him, and that it is not sufficient that he receive a plurality of votes cast or a majority if blank ballots are excluded. His claim must not depend upon the negative character of the opposition, but upon the affirmative strength of his own vote. It is not sufficient that a majority were not cast against him; to be elected, the majority must be cast for him.

"So if a board of village trustees consists *of five members, and all or four are present*, two can do no valid act, even though the others are disqualified by interest from voting, and therefore omit or decline to vote. Their assenting to the measure voted for by the two will not make it valid. If three only were present, they would constitute a quorum. Then the votes of two, being a majority of the quorum, would be valid; certainly so where the three are all competent to act." Dillon on Munic. Corp., Vol. I., Sec. 217.

These authorities answer the proposition urged by complainant that the blank vote must not be considered, and it must be treated as though only seven votes were cast and he got four. It is true that the blank vote cannot be, in the technical

5 P

sense, a ballot; but it is nevertheless an act of negation—affirmative in showing that another voter acted, and negative in determining the majority. It was one of eight, attempted to be cast with a purpose of not supporting complainant, and is only to be counted as showing that he did not get a majority; just as would have resulted had it been an illegal vote, as, being for two candidates or otherwise.

But complainant's case would be no better if that vote was entirely disregarded, because the record otherwise shows that eight Aldermen were present, and, without reference to their vote, he must have received five votes in order to be elected.

The roll-call shows eight present. On the vote to reconsider eight voted. Indeed, it is not anywhere contended by complainant that they were not all present and participating, and, as shown, the contrary affirmatively appears.

But it is said that the Mayor declared the election carried, and that this is equivalent to a vote for him, and, with four votes for him and four not for him, the Mayor's vote or action makes the election.

There are several answers to this—all conclusive.

First, the Mayor had no right to vote, as there was no tie; and, second, he did not vote.

Third, his action declaring the result without voting could not make an election, because the law does not allow him to declare a candidate elected, even on a tie, without voting, or at all.

He can only, in such case, vote and make an election; and when he does this, it makes it, even though he should then declare the candidate not elected.

A still further argument is made, however, that the Board appears to have ratified it, and this should be treated as giving it validity.

The answers to this are, if possible, even more conclusive. They are: First, that the Board has no power to elect except by ballot. There was never but one ballot cast, and if that did not make it, no election *could* otherwise be made.

Second, the Board did not ratify it. On the contrary, four members voted to reconsider, and, therefore, against ratification, and four for it. This, at best, while unimportant, was not an affirmative; it was, at most, but a tie, which the Mayor might, by his vote, have decided.

He did not choose to vote, but, instead, declared the matter lost.

In both instances the Mayor refused or failed to vote, and contented himself with declaring that the results stood accomplished without his vote.

(We are not presenting the parliamentary question, or attempting to show that four against four would rescind any legal action. We are only showing that no majority ever in any way voted to ratify the election.)

The argument need not be repeated here that this meant nothing and accomplished nothing.

The law is that they could not make an election by ratification, and the fact is they did not.

In addition to the effort to reconsider, it is said, as evidence of ratification, that on the notification, called "certificate," of the Recorder, in which he advises complainant of his election, he appends to that statement the words "by order of the Board," and that this is evidence of ratification. Having shown that ratification could not make, or make valid, an election, it is perhaps superfluous to deal with the evidences of it; but having denied the fact, it is proper not to overlook this point as bearing on the question of fact as to whether or not any act of the Board was an attempted ratification.

We have seen that the Recorder has nothing to do with the election, either to make or declare or certify it under the charter. This whole paper, including indorsement, therefore goes for nothing. His statement in a paper that he was not required to make, that it was done by order of the Board, would not prove that fact of course, and no other evidence of it is offered. He may, and doubtless did, think himself authorized to make it, and may have been ordered to do so, but no such order is produced, and nothing else proves it.

The construction herein given to the charter regulating municipal elections and the action of municipal boards is not only sound in law but in policy. It would be of the most injurious consequence to hold that municipal bodies could make elections, or appropriate money, legislate rights away, or pass measures affecting vast property in-

terests by less than an affirmative vote of an act-
ing majority. It is going sufficiently far to allow
them to act by majority of a quorum present; but
if by legislative act or judicial construction they
should be authorized to act by a minority of a
quorum, there would be no safeguards effectual to
protect the public within the scope of their author-
ity. It is equally salutary to provide, by following
well-founded principles and precedents, that what
they will not, or do not in fact, do by vote they
shall not have power to accomplish by declaring it
done without vote.

Reverse the decee and dismiss the bill with
cost.

### DISSENTING OPINION.

TURNEY, C. J., The charter of Knoxville pro-
vides: "The Board of Education shall be elected
by the Board of Mayor and Aldermen, from the
citizens and qualified voters of the town, by bal-
lot; and the term of office of each member shall
be five years."

On January 27, 1888, the Board of Mayor and
Aldermen met.

A motion "to go into an election for a mem-
ber of the City School Board to fill out the un-
expired term of Hon. M. J. Condon, resigned,"
was carried. There were present the Mayor and

eight Aldermen, who constituted, at that time, the entire Board. The ballot was taken, when it was found that J. C. Lawrence had received four votes, J. L. Fisher three votes, and a blank was found without any name on it, which was thrown out.

The Mayor declared Lawrence elected. Motion to reconsider was lost.

Lawrence was notified of his election, and on January 31 took the oath of office before the Recorder, having received from the Board a certificate of election.

The members of the Board of Education refused to permit Lawrence to sit and serve with them.

Whereupon he filed his bill, alleging his title to the office, asking that it be declared by decree, praying that defendants be required to give him notice of the meetings, and permit him to be present; that they be enjoined from meeting or transacting any business of the Board of Education without giving him notice and permitting him to be present and participate.

There was demurrer, which fully presents every question of jurisdiction in the Chancery Court, which was overruled—properly, as we hold.

There can be, in our opinion, no valid reason why a Chancery Court may not exercise its injunctive powers to restrain an unlawful act, or, as here, what seemed to be a lawful act performed in an unlawful manner. The bill did not seek, nor the fiat restrain, the meetings of

the Board and the transaction of its business. The restraint went only to the extent of inhibiting such action by four members of the Board without notice, and permission to complainant to 'be present and take part, his bill making a *prima facie* case of a right and duty on his part to do so.

It is difficult to see why a Court having the power to prohibit action may and does not have the power, derived in the same way, to command action; the reason for the one applies with like force to the other. If the Court may restrain a wrong, it may command a right. Then, if complainant was a duly elected member of the Board, he was entitled to his voice therein, and the Chancery Court had the jurisdiction to enforce his claim.

So far the Court is a unit.

The question of his election arises. Under the facts stated, a majority is of opinion there was no such election as the charter contemplates, and, in support, rely, in part, on Section 220, second volume of Dillon on Municipal Corporations, which is: "In the absence of special provision, the *major part of those present* at a meeting of a select body *must concur* in order to do any valid act." This is construed to mean that the candidate must have a majority of the votes of all present entitled to a vote, and that, while the seven voting constituted a quorum for the transaction of any business of the Board, there was not the majority of all present, and, therefore, no

election, and complainant entitled to no relief under his bill.

I do not assent to this conclusion, and am of opinion that, even under the rule laid down by Mr. Dillon, there was an election. There was no dissent to the motion for an election; therefore, to hold it, as was done, was a "valid act," to which there was a concurrence, not only of the "major part," but of all present. If it was necessary that all the Aldermen present should vote, then I am of opinion such necessity was con formed to, and that eight votes were cast, although one of the ballots was a blank. If the blank can be regarded at all, it must be as an expression of indifference by the Alderman who cast it as between the two nominated candidates, and, therefore, as an expression of consent that he who should receive a majority of those actually voting should be the elected member of the Board of Education, and (if the blank was considered at all) such was the interpretation of the Mayor when he declared Lawrence elected. Such was the interpretation of the Board in refusing to reconsider; and, also, in the unchallenged certificate of election, furnished by the Recorder, "by order of the Board," with objection from no one.

To my mind it is clear that no account should be taken of the blank ballot, nor of the nominal presence of the Alderman who cast it. He might have retired from the room, in which event I understand it to be agreed that a majority of the

seven voting would have made an election; his absence would, of itself, make the "action" of the "major part present" "valid." The question then is, Was it necessary that his absence should have carried him out of sight or hearing? I think not. When he determined (after voting that an election be held) that he would take no part in the election, he in legal contemplation absented himself from the Board, and did not change that contemplation by dropping a blank in the ballot-box any more than would the failure of a qualified voter present at the poles of a town or city election, to cast a vote; nor any more than the casting a blank by such voter would change the result. Both would be failures to vote; both would be absences from the election as a voter.

No weight should be attached to the fact that he voted for an election to be held at that meeting. That would not make him present for the election any more strongly than it would make him present for an election on the next or any subsequent day. Nothing can constitute a presence but participation. If there was participation, it was by acts signifying a full acquiescence in the action of the majority voting.

Judge Cooley, in his work on Constitutional Limitations, 3d Ed., Section 14, states the rule more strongly against the defendants than I have done. He says: "In most of the States a plurality of the votes cast determines the election; in others, *as to some elections*, a majority. But in determining upon

a majority or plurality, the blank votes, if any, are not to be counted, and a candidate may therefore be chosen without receiving a plurality or majority of voices of those *who actually participated in the election."* (Italics mine.)

Under this rule the blank is not to be counted. The presence of him who cast it was not necessary to a quorum to make an election. If he had been in fact absent, it is admitted the election would have been lawful, and free from objection. If Judge Cooley is right, it follows that, although we may hold that the casting a blank ballot was a participation in the election, still complainant, having a majority of such number as was authorized to elect, was elected, notwithstanding the presence and participation of him who cast the blank, which is not to be counted. If there had been five present at the election, with three voting for one man and two for another, or two voting blanks, or not voting at all, the election would have been complete. Here were seven actually voting, and one not, and we are asked to count the blank against the complainant. We may as well, by the same process of reasoning, count it for him. The juster rule is not to count it at all. It seems to me the rule cited from Judge Cooley is the one this State should adopt in the first case of the kind arising in our Courts. The blank was nothing, should be counted for nothing; without it or its author there was a complete quorum, and their action should be affirmed. If a quorum

may hold an election, a majority of that quorum may make an election.

Under the rule laid down by the majority, it is put in the power of one man to defeat an election when he sees that his vote for his favorite will make a tie, as then the Mayor cannot cast his vote. So if he, the voter, desires a defeat, he can accomplish it by a blank.