## L. M. COLLINS *et al. v.* J. R. JANEY *et al.*

### (*Nashville.* December Term, 1922.)

1. **SCHOOLS AND SCHOOL DISTRICT.** Discretion of county board of education not reviewable, unless fraud or violation of law involved.

 The court is without power to interfere with a contract of a county board of education in the exercise of its discretion, where there are no facts stated which constitute fraud or bad faith, or where the proposed action is not in violation of law. (*Post, p.* 484.)

2. **SCHOOLS AND SCHOOL DISTRICTS.** Contract of county board of educational not invalid because of chairman's refusal to sign; affixing of his signature may be compelled.

 If a proposed contract between a city and a county board of education for the consolidation of schools was submitted in writing and discussed by the board at its meeting and agreed to, the fact that the chairman arbitrarily refused to affix his signature would not invalidate the contract, and the court could decree its specific performance or could compel its chairman by mandamus to execute it. (*Post, pp.* 484-485.)

3. **SCHOOLS AND SCHOOL DISTRICTS.** Contract approved by majority voting held valid, though majority present did not assent to contract.

 At a full meeting of a county board of education a contract was received and discussed, and upon motion to adopt three members voted and two did not vote, the contract was declared adopted but the chairman refused to sign because not assented to by majority, *held,* that since Public Acts 1921, chapter 120, makes no provision as to number of votes necessary to pass measure, majority of those actually voting was sufficient to validate the contract. (*Post, p.* 485.)

4. **SCHOOLS AND SCHOOL DISTRICTS.** Majority of board constitute quorum under common law.

Collins v. Janey.

Under common law, a majority of a board such as a county board
of education constituted a quorum.  (*Post, p.* 485.)

Acts cited and construed:  Pub. Acts, ch. 120.

5.  **SCHOOLS AND SCHOOL DISTRICTS.** Generally number of
votes actually cast decides question, if quorum present.   .

Though greater number refuses to vote, generally the number of
lawful votes actually cast decides the question, so that, if a
quorum is present, an election is determined by the majority of
votes actually cast, though the greater number refused to vote.
(*Post, pp.* 486-489).

Case cited and distinguished: Lawrence v. Ingersoll, 88 Tenn., 52.

6.  **SCHOOLS AND SCHOOL DISTRICTS.** County board could not
rescind contract made and acted upon by approving motion to re-
scind.

After a county board of education had made a valid contract and
acted under it, it could not invalidate it by approving a motion
made to rescind the action of the board.  (*Post, pp.* 489-490.)

Acts cited and construed:  Priv. Acts, ch., 606.

---

FROM MARION.

---

Appeal from the Chancery Court of Marion County.—
Hon. T. L. STEWART, Chancellor.

Jos. HIGGINS, L. R. DARR, and W. E. McCURRY, for plain-
tiffs.

ALAN S. KELLY and W. B. STEWART, for defendants.

MR. JUSTICE McKINNEY delivered the opinion of the
Court.

The original bill in this cause was filed on November 16, 1921, by the complainants, who are citizens and taxpayers of Marion county, against the board of education of Marion county, for the purpose of enjoining them from executing the following contract with the city of South Pittsburg, to-wit:

"This contract and agreement, made and entered into on this the —— day of August, 1921, by and between the city of South Pittsburg, Tennessee, acting through its board of mayor and aldermen and school board, herein referred to as the city, and Marion county, acting through its county board of education, and the county court of Marion county herein referred to as the county, witnesseth:

"(1) The city hereby contracts and agrees to provide facilities in its white public school and to receive and teach therein all white children of school age residing outside of the corporate limits of the city and adjacent thereto, each year hereafter for the full term of the said school. The said children to be received and taught therein on the same terms and with the same privileges in said school that are allowed to children living within the corporate limits of the said city; no distinction is to be made between the said children with reference to enjoyment of the city's school facilities on account of the residence within or without the corporate limits of the city; and the city further agrees to provide the additional facilities required for compliance with its foregoing agreement and to contract and build such additional room as shall be necessary in its school building, and at its expense to provide the necessary teaching force to care for the aforesaid children of the county. The children referred to who are living out-

side of the city limits who are to receive the benefits of this contract are the children living in what is known as Hookey Hollow northwest of town, in Raulston Town, on the south side of the mountain west of the city limits, and children residing in Coburn Town, under Whiteacre's Point.

"(2) The county, in consideration of the city's foregoing agreement on its part, agrees and contracts for the purpose of aiding the city to construct and equip the addition to the city school building necessary to care for the county's said children, to allow and to pay to the city for the said purpose the sum of approximately eighteen thousand ($18,000) dollars (but not more than said sum) or such sum not exceeding eighteen thousand ($18,000) as is necessary in addition to the city's *pro rata* part of the funds derived from the recent $200,000 bond issue for school purposes to make the city a fund of forty thousand dollars ($40,000) from this source for this purpose; the said sum to be contributed by the county to be paid to the treasurer of the school board of the city by the county board of education for use by the city for the purposes aforesaid, and county further agrees to receive into and teach in its colored school north of and adjacent to the city all colored children of school age residing within the corporate limits of the city, in all respects as the city is to receive and teach the white chidren of the county as provided in paragraph one of this contract.

"(3) It is further agreed by and between the parties that the county of Marion, for the use of the school board of Marion county shall have and is hereby invested with an interest in the school building to be erected in accordance

with the provisions of this contract to the extent of the county's contribution of funds for the construction of said building. It is further agreed that if hereafter the city should fail or refuse to comply with its contract and agreement as set out in paragraph one hereof and thus breaches the same, the city will pay to the county, if it demands the same, the sum contributed by it to the construction of the building as liquidated damages, and interest from the date of the breach of the contract, and that if the city should fail to pay the same on demand of the county, the county may at its election retain the city's *pro rata* part of the county's school funds thereafter until the said sum has been paid, or proceed to the collection of the same by action at law as it may deem best.

"(4) It is further agreed between the city and county that the *pro rata* of school funds for school purposes for the city of South Pittsburg hereafter to be made is to be made on the basis of the city's actual scholastic population instead of the population served; as has been done heretofore.

"(5) This contract and agreement is to become effective and operative when formally authorized to be executed by resolution of the board of mayor and aldermen of South Pittsburg and when the board of education of Marion county shall, at a regular or special meeting called as required by law, formally authorize its execution and when signed and executed by the mayor of South Pittsburg and the recorder, and signed by the chairman of the board of education of South Pittsburg and its secretary and signed and executed by the county board of education by its chairman and when formally ratified and approved by the county

147 Tenn.—31

board of Marion county at a regular quarterly session of the court or at a special session to be called for that purpose. Said contract is to be properly acknowledged before an officer authorized to take acknowledgments of deeds, and when so formally executed is to be registered in the register's office of Marion county.

"To the faithful performance of the provisions of this contract the respective parties bind themselves and their successors in office.

"Executed in triplicate the day and date set out above. City of South Pittsburg, by Alan S. Kelly, Mayor. Attest: W. M. Cameron, Recorder and Secretary. Board of Education, South Pittsburg, Tenn., by Alan S. Kelly, Chairman."

The defendants answered the bill, denying that they had executed said contract, or that they intended to execute same.

Thereupon the city of South Pittsburg intervened by petition, and was permitted by the court to file an answer and cross-bill, in which it charged that said contract had been duly entered into, and that the parties had been operating under same since September 1, 1921; that Mr. Janey, the chairman of the board, had arbitrarily, and in violation of the order of the board and in violation of his promises, failed and refused to formally execute said contract; and it charged that, on account of such failure, those intrusted with the funds of the county had refused to pay same over; and it prayed that said contract be specifically performed, and that a decree be entered in its favor for $18,000.

Issue was taken upon the cross-bill, by proper pleadings, and proof was taken.

Upon final hearing the chancellor dismissed the orig-
inal bill, and entered a decree in favor of cross-complainant
in conformity with the prayer of its bill.

It should be stated that the county court of Marion
county, by authority of various statutes, in February, 1921,
issued bonds to the amount of $200,000, the proceeds of
which were to be used in repairing old and in erecting new
school buildings in the county.

Under the law the funds were apportioned among the
various school interests of the county, South Pittsburg re-
ceiving the sum of $21,221.44 as its share. It appears that
South Pittsburg had much the largest school in the county
and felt that it was discriminated against in said appor-
tionment, and made complaint to the State legislature, with
the result that said body, by chapter 606 of the Private
Acts of 1921, so amended the former law as to provide that
South Pittsburg should receive $50,000 of said $200,000.

The city of South Pittsburg, on February 25, 1922, filed
an original bill in the chancery court of Marion county,
in which it charged that, if the court should hold the above
contract invalid, then that it have a decree for the dif-
ference between the $21,221.44 and the $50,000, as provided
by chapter 606, referred to above.

This latter suit was consolidated with the former one,
and, upon final hearing, the bill was dismissed, the chan-
cellor being of the opinion that chapter 606 of the Private
Acts of 1921 was unconstitutional.

All of the parties have appealed to this court and have
assigned numerous errors.

We deem it unnecessary to comment in detail upon the
many questions raised, since, in our opinion, the issues

present but two queries, viz.: (a) Did the board have the authority to make the contract; and (b) did they, in fact, enter into the contract?

As to the first proposition, it is conceded that, as a general rule, they did have the right to contract for the consolidation of schools. But counsel insist that, in this instance, such a contract would be inequitable and unjust, and would operate to deprive another locality of a school.

Upon the record, as presented, we are not prepared to say that such a contract would be injurious to the county, but, even though we thought otherwise, we are without power to interfere with the action of the board in the exercise of its discretion, where there are no facts stated which constitute fraud or bad faith, or where the proposed action is not in violation of law. If it were necessary, many reasons could be given in support of the alleged contract, and many benefits pointed out which the county would receive as a result of this contract.

As an evidence of this fact, it should be stated that several months after the contract had been passed upon by the board, and after all parties had had ample opportunity to fully consider the matter, said contract was submitted to the quarterly county court and was approved by it.

The board was evidently favorable to the contract in the beginning, for it had a committee to advise with the Honorable Foster V. Brown as to whether they could legally enter into the contract, and was advised by him in the affirmative.

The only serious question that the record presents is as to whether the contract was, in fact, legally entered into. If the proposed contract were submitted in writing and

discussed by the board in its meeting and agreed to by the board, then the mere fact that the chairman arbitrarily refused to perform a ministerial act would not invalidate it, and the court could either decree its specific performance (as was done), or it could compel the chairman, by mandamus, to execute it. The result would be the same in either instance.

At a full meeting of the board on August 9, 1921, the contract in question was read and discussed, and, upon a motion to adopt it, three of the members voted "Aye," two "No," and two did not vote. It was declared adopted, and the chairman was directed to execute same on behalf of the board, whch he failed and refused to do, upon the theory, as claimed by him, that it was invalid unless assented to by a majority of the members of the board.

Was the contract lawfully entered into; that is, did it receive a sufficient number of votes to validate it? A majority of those voting approved it, but a majority of those present did not affirmatively assent to it.

By chapter 120 of the Public Acts of 1921, said board of education for Marion county was created. The act is silent as to the number of members of the board necessary to constitute a quorum, or the number of votes necessary to pass a measure.

Under the common law a majority of such a board constituted a quorum. The question here involved is how many votes are necessary to pass a measure where a quorum is present? Ordinarily it would require a majority of the quorum. But what is the rule where one or more who are present refuse to vote—is a majority of those actually voting sufficient to validate the measure under consideration?

In 28 Cyc., 339, the author says: "As a general rule, the number of lawful votes actually cast decides the question; so that it is generally held that, if a quorum is present, an election or measure is determined by the majoriy of the votes actually cast, although an equal or even a greater number refuse or fail to vote."

A number of cases supporting the above text are set forth in the note, and the following statement appears, to-wit:

"After an election has been properly proposed whoever has a majority of those who vote, the assembly being sufficient, is elected, although a majority of the entire assembly altogether abstain from voting because their presence suffices to constitute the elective body; and if they neglect to vote it is their own fault, and shall not invalidate the action of the others; and such election is valid, although the majority of those whose presence is necessary to the assembly protest against any election at the time, or even the election of the individual who has the majority of votes. Willcock, Mun. Corp., section 546. Those who are present, and who help to make up the quorum, are expected to vote on every queston, and their presence alone is enough to make the vote decisive and binding, whether they actually vote or not. The objects of legislation cannot be defeated by the refusal of any one to vote when present. If eighteen are present, and nine vote, all in the affirmative, the measure is carried, the refusal of the other nine to vote being construed as a vote in the affirmative so far as any construction is necessary. Horr & B. Mun. Pol. Ord., section 43."

Mr. Dillon, in his work on Municipal Corporations (5th Ed.), section 527, says:

"Minorities of councils and other deliberative bodies sometimes resort to obstructive tactics to defeat measures which they have reason to believe the majority favor. One of such methods is by a refusal to vote, by reason whereof a measure may be deprived of the support of a majority of the council present and participating. But the courts have steadfastly adhered to the rule that when members are present at a meeting, a mere refusal to vote on the part of some of the members cannot defeat the action of the majority of those actually voting. As long as the members are present in the council chamber and have an opportunity to act and vote with the others, it is their duty to act, and they will be regarded as present for the purpose of making a quorum and rendering legal the action of the council. Slightly divergent views have been expressed by the courts as to the effect of a refusal of members of a council to vote, although the courts are unanimous in declining to permit such refusal to defeat an expression of the will of the body. Thus, in some jurisdictions, it is said that silence or refusal to vote is concurrence, as it is the duty of the silent members to express their opinion if they desire to oppose the question before the council, and if they fail to perform their duty, they must be taken as assenting to the action of the majority of those who do vote."

We have been unable to find any authority to the contrary.

It is insisted, however, by counsel for the board, that this court held otherwise in the case of *Lawrence* v. *Ingersoll*, 88 Tenn., 52, 12 S. W., 422, 6 L. R. A., 308, 17 Am. St. Rep., 870.

. In that case it appears that the board of mayor and aldermen of Knoxville consisted of a mayor and nine al-

dermen, the mayor being empowered to vote only in case of a tie. The charter of the city also provided how the members should vote. At a meeting of the board of mayor and aldermen to fill a vacancy on the school board, the mayor and eight aldermen were present. Four aldermen voted for Lawrence, three against him, one cast a blank vote, and the mayor did not vote. The court, in a divided opinion, held that Lawrence was not legally elected, and used this pertinent language, to-wit:

"We have seen that it is not only not differently regulated by the charter of Knoxville or other statute of Tennessee, but that the charter provides for the transaction of business only by a majority of a quorum, and gives the Mayor a right to vote when the majority thereof cannot decide, thereby conclusively showing that a majority must concur, or there is no result."

Furthermore, in that case, the court was dealing with the question of the effect of a blank vote, a question not here involved, and based its decision largely upon Dillon on Municipal Corporations.

Mr. Dillon, in his latest edition (5th), treats a refusal to vote and a blank vote as distinct and different. We have already quoted what he has to say as to the former. As to the latter, in paragraph 528, he says:

"The nature and effect of a blank ballot cast by a member of a city council at an election for an officer, has been before the courts for consideration and the weight of authority, and, as we think, the better view is, that the blank ballot is a mere nullity; that it cannot be counted for or against either of the candidates voted for; and that the vote for the candidates is to be determined by a majority

of the valid ballots actually cast. But in Tennessee the supreme court took a different view, and held that a blank vote was an act of negation, affirmatively showing that another person acted, and to be considered negatively in determining the majority, and that a candidate who only received the votes of one-half of the members participating and casting the ballots was not elected to office. It has, however, been pointed out that the rule that blank ballots are nullities can have no application when the statute requires the affirmative action of a majority of the entire body, or a majority of all the members present. Then the blank ballot cannot be counted on the affirmative side, and for lack of sufficient votes in the affirmative, the proposal may be defeated."

But, as previously stated, the decision in *Lawrence* v. *Ingersoll* was based primarily upon the construction placed upon the charter of Knoxville, which has no application in the instant cause. We hold, therefore, as the chancellor did, that the contract was lawfully agreed to, and placed in operation by the parties.

The board, after this suit was instituted to-wit, on December 27, 1921, undertook to rescind the contract, as appears from its minutes as follows:

"A motion was made by William A. Long and seconded by Stanley Allan to rescind the action of the school board in agreeing to consolidate certain schools in and around South Pittsburg, and to pay South Pittsburg $18,000 out of the proceeds of the school bonds, in addition to her *pro rata* part of the bond sale amounting to approximately $28 *per capita*, the same as the children in all other parts of the county received. A vote was taken on this motion

resulted as follows: For the motion, William A. Long, Stanley Allan, John E. Smith and J. E. Janney. Against the motion, W. H. Klein and J. N. Bearden. The motion was declared carried."

It thus appears that the board realized that it had entered into a contract with the city of South Pittsburg, and, of course, having made the contract and acted under it, could not invalidate same in this manner.

Other technical objections have been interposed as invalidating said contract, but, after a careful consideration, we find them without merit.

It results that the decree of the chancellor will therefore be affirmed.

It is unnecessary to pass upon the validity of chapter 606 of the Private Acts of 1921.

The original complainants will pay one-third, and the board of education will pay two-thirds of the costs of the appeal.