**Neal WOOLEY et al., Appellants,**

**v.**

**W. L. STERRETT, County Judge, et al., Appellees.**

**No. 16546.**

Court of Civil Appeals of Texas.

Dallas.

Feb. 19, 1965.

Gibbs & Hooks, Dallas, for appellants.

Franklin E. Spafford, Richard S. Geiger, Henry Wade, Dist. Atty., and Don R.

Stodghill, Asst. Dist. Atty., Dallas, for appellees.

WILLIAMS, Justice.

By authority of Art. 9.17, Election Code, V.A.C.S., appellants appeal from the judgment of the district court denying their relief in an election contest. The Seagoville Independent School District was what is commonly called a "county line" school district, a portion of the properties thereof being situated within an area in the southern portion of Dallas County, Texas, and a smaller portion of said district being situated in a northern area of Kaufman County, Texas. Pursuant to authority contained in Art. 2767, Vernon's Ann.Civ. St., the Honorable W. L. Sterrett, County Judge of Dallas County, Texas, did on July 28, 1964, enter an order in the Commissioners Court minutes calling for an election, designating the date of the election to be August 13, 1964 in the Seagoville Independent School District, and stating the purpose of such election to be to determine the following proposition: "Shall the Seagoville Independent School District be abolished?" Pursuant to such order, the voting machines to be used in such election were prepared and the sole proposition was placed upon the machine ballot, worded as follows:

"FOR ABOLISHING OF SEAGOVILLE INDEPENDENT SCHOOL DISTRICT"

"AGAINST ABOLISHING OF SEAGOVILLE INDEPENDENT SCHOOL DISTRICT"

---

The election was held on August 13, 1964 and at the conclusion thereof a certificate of election was duly made by the presiding judge, various clerks, judges and watchers. This certificate stated that 622 voted for the proposition and 565 voted against the proposition. It was also recited that 1,276 was the total number of votes cast. Thereafter, on August 14, 1964, County Judge W. L. Sterrett entered an order declaring results of election, said order reciting that 622 votes were counted for abolishing the district and 565 votes counted against abolishing the district. The order then states:

"3. That it is hereby found, determined and declared to be the result of said election that the said Proposition so submitted has received a favorable majority vote and has carried.

"4. That in accordance with the result of said election the Seagoville Independent School District is hereby abolished."

On August 20, 1964, pursuant to authority of Art. 2922-18, V.A.C.S. the County Board of School Trustees of Dallas County passed an order annexing to Dallas Independent School District of Dallas County, Texas that portion of the area of the former Seagoville Independent School District which was situated in Dallas County, Texas.

On August 18, 1964 Neal Wooley and others, being tax payers and qualified voters within the former Seagoville Independent School District, brought this action in the nature of an election contest, as authorized by Art. 5, § 8, of the Constitution of the State of Texas, Vernon's Ann.St. and Art. 9.01, et seq., Election Code, V.A.C.S., naming County Judge W. L. Sterrett, and other officials, defendants, and therein contending that the vote for abolishing the Seagoville Independent School District had not carried by a majority of votes cast in the election. Contestants alleged, *inter alia,* that at said election "many people were disfranchised and such disfranchised voters were in sufficient numbers to have materially changed

the result of such election and the election official and his judges exercised undue influence and so conducted themselves as officials of the election that many voters were intimidated and did not cast their ballots as a free exercise of their discretion." Contestants also allege that the election judges and officials violated Art. 8.13, Election Code, V.A.C.S., by giving unauthorized aid to voters and by exercising undue influence on many voters. Contestants requested and were given a temporary restraining order, restraining respondents from taking any further action relating to the abolishment of such school district pending final hearing of the litigation. This restraining order was dissolved by agreement of the parties on August 19, 1964, and at that time, upon agreement of counsel, the contest was set down for hearing on its merits for August 26, 1964. The court, without a jury, heard the case on its merits on August 26 and 27, 1964 and then entered a judgment denying contestants the relief sought. This appeal followed.

■ Before determination and disposition of appellants' (contestants) points we deem it desirable and appropriate to direct attention to and discuss the character of the proceedings before us. An election contest does not partake of the usual characteristics of the ordinary case in law or in equity. While the Constitution and laws of the state specifically confer jurisdiction of election contests on district courts, and specifically provide for appeals in such cases to the Court of Civil Appeals, such contests involve political questions, rather than judicial questions, and therefore lack the elements of a civil suit. 21 Tex.Jur.2d § 152, pp. 405, 406; Adamson v. Connally, Tex.Civ.App., 112 S.W.2d 287; Gibson v. Templeton, 62 Tex. 555. Our courts have repeatedly said that an election contest is not a civil suit in the true sense of that term. Williamson v. Lane, 52 Tex. 335; Ladd v. Yett, Tex.Civ.App., 273 S.W. 1006; Maddox v. Commissioners Court of Palo Pinto County, Tex.Civ.App., 222 S.W.2d

475. It is said that election contests are political proceedings, legislative proceedings, quasi-judicial proceedings, and other such designations. Duncan v. Willis, 157 Tex. 316, 302 S.W.2d 627; Wright v. Fawcett, 42 Tex. 203; Dickson v. Strickland, 114 Tex. 176, 265 S.W. 1012; Robinson v. Hays, Tex.Civ.App., 62 S.W.2d 1007; Adamson v. Connally, supra. All courts are in accord in holding that an election contest is a statutory proceeding in which statutory requirements must be met and the contest can only be maintained when all of such statutory requirements have been completely satisfied. 21 Tex.Jur.2d, § 152, p. 407; Maddox v. Commissioners Court of Palo Pinto County, supra; Gonzalez v. Rodriguez, Tex.Civ.App., 250 S.W.2d 253; Horine v. Kellam, Tex.Civ.App., 123 S.W. 2d 439; Magnolia Petroleum Co. v. Jackson County Water Control & Improvement Dist. No. 1, Tex.Civ.App., 290 S.W.2d 310; Christy v. Williams, Tex.Civ.App., 292 S.W. 2d 348.

■ Moreover, it is important to bear in mind that election contests may not be conducted as a matter of private right. 15–B Tex.Jur., § 143, p. 515; Dickson v. Strickland, supra.

With these broad principles in mind we approach the question of scope of review of an election contest. What is the ultimate test of the validity of an election? Shall the election laws be given a strict or a liberal construction?

■ The answer to the first question is given by Justice Roberts of our early Supreme Court in McKinney v. O'Connor, 26 Tex. 5 (1861), wherein he said:

"* * * rules prescribing the manner in which the qualified electors shall hold the election, at the time and place designated, and those prescribing the manner in which their act, when done, shall be authenticated, so as to import verity on its face, are directory. Irregularities in their observance will not vitiate an election,

unless they be such that the true result of the ballot cannot be arrived at with reasonable certainty. The ultimate test of the validity of an election is involved in the questions: *Did the qualified electors, at the time and place designated, acting in concert, either actively or by acquiescence, hold an election and cast their votes in the ballot box; and has it been done in a manner sufficiently conformable to the directions of the law, as that the true re*sult can be arrived at with reasonable certainty?" (Emphasis supplied.)

■ As to the application of a liberal or strict construction of election laws we are told by Justice Gaines in Davis v. State ex rel. Wren, 75 Tex. 420, 12 S.W. 957:

"The main design of all election laws is, or should be, to secure a fair expression of the popular will, in the speediest and most convenient manner; and we think a failure to comply with provisions not essential to attain that object should not avoid the election, in the absence of language clearly showing that such was the legislative intent."

■ The Supreme Court in Thomas v. Groebl, 147 Tex. 70, 212 S.W.2d 625, said:

"The right to vote is so fundamental in our form of government that it should be as zealously safeguarded as are our natural rights. It has been said that 'laws abridging the natural right of the citizen should be restrained by rigorous constructions within their narrowest limits.' It is sufficient, however, that we apply here the less extreme and well established rule of construction that statutes regulating the right to vote should be given a liberal interpretation in favor of that right."

In Ramsay v. Wilhelm, Tex.Civ.App., 52 S.W.2d 757, the Court said:

*"But to enforce a strict observance of all of the directory provisions of the statute, absent proof of unfairness or dishonesty, would more often defeat than effectuate the popular will; and it is probable that but few elections would stand such a scrupulous test."* (Emphasis supplied.)

The right to free exercise of intelligent choice by a citizen at the polls is surely one of the most treasured of all American heritages guaranteed by the Constitution and Bill of Rights. We do not believe it can be said that the free exercise of this right is to be unreasonably curtailed or restricted by judicial decree which places a narrow or strict construction on legislative rules. Mitchell v. Jones, Tex.Civ. App., 361 S.W.2d 224.

■ Finally, it is appropriate to observe that in this unique type of action time is of the essence. The very nature of the proceedings is such that courts are called upon to speedily and expeditiously dispose of the subject matter without regard to some of the usual rules applicable in the ordinary civil action. Duncan v. Willis, 157 Tex. 316, 302 S.W.2d 627; Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515, 70 A.L.R. 1484; Sterling v. Ferguson, 122 Tex. 122, 53 S.W.2d 753; Polk v. Davidson, 145 Tex. 200, 196 S.W.2d 632.

Being ever mindful of these well established landmarks of jurisprudence which guide us in our approach to the problems presented by this appeal we now turn to a consideration of appellants' first point of error which complains of the trial court's action in overruling appellants' motion for continuance.

On August 26, 1964, appellants filed their motion for continuance based upon the absence of Judge W. L. Sterrett, County Judge of Dallas County, Texas. The motion alleges inability to obtain service of a subpoena upon Judge Sterrett and as to the materiality of the absent witness' testimony, appellants say:

"Plaintiffs would further show that it is essential that this witness testify

as to the matters contained in the Order declaring the Seagoville Independent School District abolished, and to state the basis upon which such Order was entered and the facts and other returns and orders upon which such Order was made."

The motion further alleged that plaintiffs expected to prove by the witness Sterrett that no proper order, written or oral was made appointing the presiding officer and other officials who served at the election in question, and that "the official election returns show that a total number of voters who cast votes was 1,276, which was not a majority of those voting to abolish such Independent School District."

■ Appellants' point 1 is without merit and must be overruled for several reasons. The election in question was held just prior to the commencement of the scheduled opening of schools for September 1964. The filing of the election contest on August 18, 1964, and the obtaining of a temporary restraining order, threatened chaos as to the orderly administration of the School Board business. Time, indeed, was of the essence in this proceeding. The Legislature recognizes such by directing that precedence by given such actions both in a trial court and in the appellate courts. Moreover, the record shows that the case was set for trial on August 26, 1964 by agreement of both parties. As to Judge Sterrett's expected testimony relating to his order both calling the election and approving the result thereof, the record is without dispute that both orders were introduced into evidence by appellants without objection. Had Judge Sterrett been present to testify he certainly could not have impeached his former orders by parol testimony. His duties in issuing the order and in approving the result of the election were purely statutory. As to appellants' allegation that "a total number of voters who cast votes was 1,276, which was not a majority of those voting to abolish such independent school district," such statement is unintel-

ligible and unworthy of consideration by the trial court. Finally, the record does not demonstrate that the trial court abused its discretion in overruling this continuance, nor is it shown that the court's action probably resulted in the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure.

By their second point appellants contend that the order of the trial court affirming the results of the election was against the weight and preponderance of the evidence in that 1,276 persons voted, according to the official election returns, and only 622 voters voted for the proposition so that such number is not a majority of the total number of votes cast so as to legally abolish the independent school district. Appellants argue that Art. 2767, V.A.C.S. specifically provides that "a majority of such voters, voting at such election" must vote to abolish a school district. They urge that when the 622 votes "For" and 565 "Against" are added together that a total of 1187 votes were actually cast for or against the proposition, thus leaving 89 votes unaccounted for. Appellants urge that the 89 votes, being referred to as "shrinkage" must be counted in determining whether a majority of the votes "cast at such election" voted to abolish the school district. Appellants candidly concede that they have found no Texas case supporting their contention that blank ballots must be considered in determining the fact of majority. They rely upon cases from other jurisdictions such as Lawrence v. Ingersoll, 88 Tenn. 52, 12 S.W. 422, 6 L.R.A. 308; City of Wellsville v. Connor, 91 Ohio St. 28, 109 N.E. 526; Enyart et al. v. Trustees of Hanover Township, 25 Ohio St. 618; and State ex rel. v. Foraker, Governor, 46 Ohio St. 677, 23 N.E. 491, 6 L.R.A. 422. However, the majority rule in the United States is contrary to the position taken by the appellants. In 18 Am.Jur. § 246, p. 342, the rule is stated:

"There is some conflict among the cases as to whether illegal, rejected, and blank ballots shall be counted in

**740**

determining the total vote cast. The weight of authority adheres to the view that a qualified voter who succeeds in getting his name on the poll list and a ballot in the ballot box is not a voter unless his ballot is such as is prescribed by law, and that blank and illegal ballots should be rejected in computing the number of votes."

 We do not believe that it is, or should be, the law in Texas that blank ballots, or ballots that do not legally register the will of the voter, should be computed in determining a majority. The statutory provision that a determination of the issue must be by a majority of the "votes cast at the election" surely means the majority of votes "legally" cast and reflecting the free exercise of choice by the voters. We think Texas should follow the majority rule as illustrated in the case of Munce v. O'Hara, 340 Pa. 209, 16 A.2d 532, 131 A.L.R. 1379, by the Supreme Court of Pennsylvania, which rejected a similar contention as here made by appellants.

 What is the meaning of the word, "vote"? Webster's New International Dictionary, Second Edition, says: "vote, v.; * * * Intransitive * * *. 2. To express or signify the mind, will, or preference, either viva voce, or by ballot, etc., as a means of deciding on any proposition in which one has an interest with others; to cast or give a vote; * * *." The word "elect" is defined as: "To determine by choice; to decide upon; to choose"; and the word "election" means "The act of choosing between alternatives." Reason and common sense dictate that the verb "vote" carries with it the implication of *affirmative choice by action*. The word "vote" cannot be equated with total failure of choice.

An examination of this record clearly reveals why the discrepancy appeared in the return of the election officials. The election in question was held with the use of two voting machines. These voting machines had "public counters" which registered whenever a prospective voter entered the machine and pulled the lever closing the curtains and then again pulled the lever, thereby opening the curtains. Each machine also contained a counter registering a vote whenever the voting lever was pulled by the voter expressing his choice for or against the proposition. The return of the election officials reflected that the public counters showed 1,276 people entering the machines, being designated on the return as "total number of votes cast" and also showing that only 1,187 votes were registered. Obviously, 89 people entered the machines, according to the public counter, who did not exercise their choice by pulling the lever for or against the proposition, or who failed to properly and legally complete the voting procedure. The record reveals that a great deal of confusion existed during the election because elections previously held had used paper ballots. Many people were unfamiliar with the manner of voting by voting machines. This is illustrated in the testimony of Ona Tucker who testified that he did not know how to use the voting machine and asked the election judge for assistance and was told by such judge to pull down the lever indicating his choice. He said he went into the machine and pulled the curtain to and made an effort to pull down the lever but could not do so. He then pulled the lever opening the curtains and stepped outside and asked for more assistance, then went back into the machine and pulled the lever again closing the curtains of the machine. This time he pulled the lever down but *then pushed it back up* and then pulled the lever opening the curtains and departed from the machine. By this procedure two numbers were indicated on the "public counter" and no numbers were indicated on the votes cast for the simple reason that by pulling the lever down and then pulling it back up no vote was registered. We think, from a review of the entire record, that it is entirely reasonable and plausible that many other voters did the same thing as Mr.

Tucker, which would clearly account for the 89 "blank" votes.

The appellants offered in evidence the order of the County Judge in which he officially determines that a majority voted for the proposition to abolish the school district. The trial court in upholding the results of the election necessarily made findings in support of his order and such findings are, in our opinion, supported by ample evidence. In Fox v. Nail, Tex.Civ. App., 294 S.W.2d 407 the court held that the trial judge is vested with wide discretion in passing upon election contests and that such discretion will not be disturbed on appeal unless there is sufficient evidence of probative force of fraud or illegality in counting the ballots. In this case appellants, in their pleadings, do not even allege fraud, nor is there any proof of fraud. We find no abuse of discretion on the part of the trial court in this case and find that he correctly applied the law to the facts before him in declaring the election to be fairly held. Appellants' second point is overruled.

By their third point, multifariously framed, appellants contend that the trial court erred in failing to void the election because the judges and clerks violated the election code in (a) using placards, posters, or other written instructions not in the English language, and by using signs, symbols and gestures which constituted unauthorized assistance to the voters; (b) in campaigning upon the issue in question by using statements and sample ballots which were misleading, false and confusing; (c) by assisting the electors within the voting machines without the presence of another judge; (d) by incorrectly instructing voters who sought aid, such instructions being contrary to the desire and intent of such voters.

Appellants introduced evidence by many of the voters establishing that, without controversy, many of the persons appearing at the polls were confused by the use of voting machines. It was also developed that considerable confusion resulted from the manner in which the proposition was submitted, same being in the double negative form. It was also established that many voters requested aid from the judges and election clerks and that on many occasions such aid was given. From several witnesses it was developed that Mr. Ballard, the election judge, prepared a placard with the letter "D" over the word "For" and the letter "S" over the word "Against". It was testified that when voters would ask the meaning of the ballot that the placard would be used to explain that if the voter desired the independent school district to go to the Dallas district that they should pull the "For" lever but should they desire the district to remain with Seagoville that they should pull the "Against" lever.

■ A review of the entire record in this case clearly indicates that the election in question was not held with the degree of perfection that should be desired. Many instances of confusion and technical irregularities abound in this record. Many of the voters were aged and could neither read nor write. A great number of the voters did not understand the mechanism of the voting machines. Many of the voters requested and received assistance of the voting officials. There is no evidence that any voter actually voted pursuant to instructions of a judge and thereby voted contrary to his intention. There is no allegation or evidence of fraud on the part of any election judge or official. The record is silent as to how the voter actually voted after he received the instructions and assistance from the election judges or clerks. Mr. Jack Ballard, the presiding judge, testified that he "was interested in a fair and impartial election," and did not even vote, though qualified to do so. Olin Glenn, a judge, testified that he had conducted elections in some capacity over a period of twenty-five years. He said, "I think it was a fair and impartial election, I think it was held and everything was tried to be carried out in a legal way." Mrs. Fisher, one of the officials, who was op-

posed to the proposition as submitted denied that she attempted to influence or mislead any voter. Mollie Collins, a poll watcher, selected by those who opposed the proposition, testified that "It was run as good as one could be run."

In Ramsay v. Wilhelm, Tex.Civ. App., 52 S.W.2d 757, wr. ref., the court pointedly discussed the overall situation with which we are here confronted. It was there stated:

"It is common knowledge that such matters are usually intrusted to laymen, and that in sparsely populated counties and small towns a strict compliance with all the provisions of the statutes is seldom, if ever, observed. The will of the legal voters as expressed at the polls is the matter of paramount concern, and, in the absence any showing of fraud, or reasonable indication that such will has not been fairly expressed and the evidence thereof properly preserved, the courts have been liberal in construing and enforcing as directory only the provisions of the election laws which are not upon their face clearly mandatory. * * * And, absent evidence of fraud, unfairness in the holding of an election, or tampering with the ballots or returns, the courts of this state have uniformly held that ballots cast by legally qualified voters should be given effect * * *."

The tendency on the part of the courts to construe Election Code provisions as directory rather than mandatory is salutory because it leads to the true expression of the will of the voters. Stafford v. Stegle, Tex.Civ.App., 271 S.W.2d 833; Moore v. Pitman, Tex.Civ.App., 280 S.W. 873; McJimsey v. Yates, Tex.Civ.App., 324 S.W.2d 438.

In McJimsey v. Yates, supra, which involved a contest of a school consolidation election, the court discussed a similar complaint of assistance rendered voters in violation of Art. 8.13, Election Code, V.A.C.S., and held that such assistance did not violate the law to such extent as contended by appellants here. The court said:

"The evidence does not show that the voters whose votes were held to be illegal for receiving unauthorized assistance and the holdings complained of on appeal were assisted in marking their ballots. They were only informed how to mark their ballots in order to express their intent and desire. There is no evidence in the record that the election judges or their helpers through such explanatory assistance caused any person to change his vote."

Without extending this opinion further, we deem it sufficient to state that we have carefully examined the entire record and find that no reversible error is shown by appellants' points. The trial court, by its judgment, impliedly found that the election was fairly held and we believe that such finding is supported by ample evidence.

We think the matter is aptly summarized by Chief Justice Murray of the San Antonio Court of Civil Appeals in Stafford v. Stegle, Tex.Civ.App., 271 S.W. 2d 833 wherein he says:

"While those charged with conducting elections should use every precaution possible to see that elections are conducted strictly in accordance with the provisions of the Election Code, nevertheless, after an election has been held and it appears that it has been fairly conducted and the result correctly declared, and there [are] no charges of fraud, misconduct or illegality, the entire election will not be set aside for irregularities in the manner of conducting the election, unless the statutes governing such matters state that the election must be vitiated. It appears here that the result would have been exactly the same even if the irregularities complained of by appellants had not occurred. There was no evidence

which indicates anything to the contrary. It would indeed seem to be a useless thing to set an entire election aside because of irregularities, where there is nothing to indicate that the result would be any different if a new election was ordered and held with no irregularities occurring."

No reversible error being apparent the judgment of the trial court is affirmed.

Affirmed.