**Joseph F. ADA; Felix P. Camacho, Plaintiffs–Appellees,**

v.

**GOVERNMENT OF GUAM; Guam Election Commission, and its commissioners; Joseph F. Mesa, Commissioner; Joseph T. Duenas, Commissioner; Frederick J. Horecky, Commissioner; Douglas B. Moylan, Commissioner;**

Rosanna D. San Miguel, Commissioner;
Leonila L.G. Herrero, Commissioner,
Defendants,

and

Carl T.C. Gutierrez; Madeleine Z.
Bordallo, Real Parties in
Interest-Appellants.

No. 98–17306.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1999.

Decided April 19, 1999.

674

Seth M. Hufstedler, Morrison & Foerster, San Francisco, California, F. Philip Carbullido, Carbullido, Bordallo & Brooks, Agana, Guam, for the real parties in interest-appellants.

Dennis Riordan, Donald M. Horgan, Riordan & Rosenthal, San Francisco, California, Curtis Charles Van de Veld, The Van de Veld Law Offices, Agana, Guam, for the plaintiffs-appellees.

Before: NOONAN and TASHIMA, Circuit Judges, and RESTANI, Court of International Trade Judge.*

TASHIMA, Circuit Judge:

▮ On November 3, 1998, Guam held a general election in which Carl T.C. Gutierrez and Madeleine Z. Bordallo (together "Gutierrez") ran against Joseph F. Ada and Felix P. Camacho (together "Ada") for the offices of governor and lieutenant governor, respectively. Gutierrez received 24,250 votes, and Ada garnered 21,200 votes. After the Guam Election Commission certified Gutierrez as the winner, Ada filed suit in federal court seeking a declaration that Gutierrez was not elected by a majority of the votes cast, as required by the Guam Organic Act and a writ of mandamus requiring a runoff election to be held. The district court granted Ada's petition for a writ of mandamus. Gutierrez appeals, contending that the district court misinterpreted federal law and therefore erred in ordering a runoff election. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1),[1] and we affirm.

I.

48 U.S.C. § 1422 sets forth the qualifications for the offices of governor and lieu-

---

* The Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

1. In his complaint, Ada challenged the election results on two bases: that the district court misinterpreted federal law and that the election had been riddled with voting irregu-

tenant governor of the Territory of Guam and the electoral procedures for filling these offices. *See* 48 U.S.C. § 1422 (1987). The governor and lieutenant governor are elected jointly; therefore, candidates for these offices must run together on a slate. *See id.* The prevailing candidates are those who receive a majority of the votes cast. *See id.*

> The Governor of Guam, together with the Lieutenant Governor, shall be elected by a majority of the votes cast by the people who are qualified to vote for the members of the Legislature of Guam. The Governor and Lieutenant Governor shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices. If no candidates receive a majority of the votes cast in any election, on the fourteenth day thereafter a runoff election shall be held between the candidates for Governor and Lieutenant Governor receiving the highest and second highest number of votes cast.

*Id.*

At stake at the general election on November 3, 1998, were the offices of governor and lieutenant governor, delegate to the United States Congress, membership in the Guam legislature, and on various school boards. The Democratic gubernatorial slate of Gutierrez and Bordallo garnered 24,250 votes and the Republican gubernatorial slate of Ada and Camacho received 21,200 votes. An additional 1,294 voters voted for write-in candidates; 1,313 persons who voted in the general election neither voted for a gubernatorial slate nor cast a write-in vote ("blank ballots" or "undervotes"); and 609 persons voted for both slates ("overvotes"). The sum of these ballots was 48,666, of which Gutierrez received 49.83% and Ada received 43.56%.

On November 16, the Guam Election Commission [2] certified that the Gutierrez slate had won with 51.21% of the vote. The Election Commission arrived at this result by deducting the 1,313 undervotes from the total ballots cast, resulting in a total of 47,353 ballots. Write-in ballots and overvoted ballots were included in the total from which a majority was determined.

■ On December 1, Ada filed a complaint in the District Court of Guam seek-

larities. The district court deferred addressing the latter issue:

> Though the Court now restricts this ruling to the isolated issue of interpretation of the Organic Act, the Court defers rather than rejects ruling on the other aspects of the election. If the territory's administrative and judicial corrective process timely and sufficiently addresses other questions and discrepancies of the election, thereby affording fundamental fairness to the voters of this territory, further intervention of a federal court should not prove necessary. If it does not, then, this Court will intervene.

Because the district court's order did not provide Ada with all of the relief he sought, and because the district court did not certify the entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b), Gutierrez's appeal is interlocutory in nature, despite the parties' agreement that we have jurisdiction under 28 U.S.C. § 1291.

28 U.S.C. § 1292(a)(1), however, authorizes appeals from "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1) (1998). It is immaterial that the district court's order was labeled a writ of mandamus instead of an injunction because "[i]n determining the appealability of an interlocutory order under 28 U.S.C. § 1292(a)(1), we look to its substantial effect rather than its terminology." *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998) (quoting *Tagupa v. East–West Ctr., Inc.,* 642 F.2d 1127, 1129 (9th Cir.1981)) (internal quotation marks omitted) (alteration in original). Because the district court's order had the same effect as a mandatory injunction, this court has jurisdiction pursuant to § 1292(a)(1). *See Tagupa*, 642 F.2d at 1129 (finding the denial of a writ of mandamus appealable under § 1292(a)(1)).

**2.** The Guam Election Commission is composed of three individuals nominated by the Republican Party, three individuals nominated by the Democratic Party, all selected by the governor, and a seventh member selected by the other six members. At the time of the November 3 election, the seventh member had not been selected.

ing a declaratory judgment that Gutierrez had not been elected by a majority of the votes cast, as required by § 1422, and a writ of mandamus ordering that a runoff election be held.[3] On December 9, the district court held in favor of Ada and granted a writ of mandamus ordering that a runoff election be held on December 19.[4] On December 15, a motions panel of this court issued an emergency stay of the district court's order pending the outcome of this appeal.

Gutierrez contends that the district court erred in issuing the writ of mandamus because the inclusion of undervotes in the "votes cast" contradicts the plain language of § 1422, prior case law, Guam election law, and common sense.

## II.

■■■ We review the district court's decision to issue a writ of mandamus for an abuse of discretion. *See Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502,

505 (9th Cir.1997). A district court abuses its discretion if "its decision is based on clearly erroneous factual findings or an incorrect legal standard." *Id.* The interpretation of a statute is a question of law reviewed de novo. *See Alexander v. Glickman,* 139 F.3d 733, 735 (9th Cir.1998).

## III.

■■■ As with all exercises in statutory interpretation, we begin with the statute's text. We "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *United States v. Hockings,* 129 F.3d 1069, 1071 (9th Cir.1997) (internal quotation marks omitted) (citation omitted). If the statute is ambiguous, resort to legislative history is appropriate. *See id.*

### A. *48 U.S.C. § 1422*

■■■ Gutierrez argues that § 1422 is unambiguous in including only votes actu-

3. On the same day, Ada filed a companion lawsuit in Guam Superior Court, which the district court characterized as "focus[ing] on interpretation of local law and allegations of voting irregularity, not the federal question." On February 16, 1999, the Superior Court found that Ada had failed to prove his allegations of election irregularities and held that the Gutierrez slate had won the election. *See Ada v. Gutierrez,* No. CV 2765–98, at 233 (Guam Super.Ct. Feb. 16, 1999). In so finding, the Superior Court "respectfully disagreed with the determination reached by the District Court on the majority issue, and with regard to the above captioned matter, such determination shall be applied to the issues involved herein." *Id.* at 85. Specifically, the Superior Court decided that undervotes, overvotes, and write-in votes for which the voter selected the write-in option but did not write in a name should not be counted as "votes cast." *See id.* at 83–84.

Gutierrez does not contend that the Guam Superior Court's order should be given preclusive effect. We agree that we are not bound by the decision of the Guam Superior Court, if for no other reason than because it is currently on appeal to the Supreme Court of Guam. Although we find no Guam decision holding that a judgment on appeal has no preclusive effect, title 6, § 4209 and title 7, § 26707 of the Guam Code, which govern the

preclusive effect of final judgments, are essentially identical to California Civil Procedure Code §§ 1908 and 1049 respectively, and therefore should be similarly interpreted. "Appellate courts have consistently recognized that decisions of California courts which predate the enactment of the Territorial Laws are controlling authority on issues of the statutory construction and effect of Guam laws, and that California cases subsequent to the adoption of the Guam codes while not binding, are persuasive." *Roberto v. Aguon,* 519 F.2d 754, 755 (9th Cir.1975). It has been long established in California that a judgment is not final for purposes of res judicata while the judgment is on appeal. *See, e.g., Brown v. Campbell,* 100 Cal. 635, 35 P. 433, 436 (1893) (citing Cal.Civ.Proc.Code. § 1049); *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58, 72 n. 11 (1979) (same). Therefore, it appears that the Guam Superior Court's order is not entitled to preclusive effect.

4. The order provides, "IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Guam Election Commission shall hold a runoff election as referred to in § 1422 of the Organic Act. The runoff election between the Democratic and Republican gubernatorial candidates shall be held on Saturday, December 19, 1998."

ally and validly cast 'for the gubernatorial race in the calculation of a majority. By employing the phrase "votes cast," Gutierrez contends that Congress necessarily excluded ballots on which votes were not cast for governor and lieutenant governor. Furthermore, Gutierrez urges that the sentence "The Governor and Lieutenant Governor shall be chosen jointly, *by the casting by each voter of a single vote* applicable to both offices," § 1422 (emphasis added), implies that "votes cast" encompasses actual votes—not ballots blank with respect to the governor's race. Gutierrez also relies on legislative history to buttress his interpretation.

Ada reaches a contrary conclusion by relying on a different portion of § 1422: "If no candidates receive a majority of the votes cast *in any election,* on the fourteenth day thereafter a runoff election shall be held ...." § 1422 (emphasis added). Ada argues that if Congress had intended for a majority to be measured by the votes cast only in the gubernatorial race rather than the votes cast in the entire election, it would have said so, instead of using the phrase "in any election."

Section 1422 provides for a runoff election in the event that "no candidates receive a majority of the votes cast in any election." Because Congress provided no other direction in § 1422 for determining what constitutes a majority, we must give effect to these words. We read "votes cast" as including all votes cast at the general election, for Congress presumably would not have included the phrase "in any election," if it meant to refer only to the votes cast in the single election for governor and lieutenant governor.

Gutierrez would have this court reject this interpretation because in providing that the victors "shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices," Congress made clear its intent that an actual vote must be cast for a gubernatorial candidate to constitute a vote cast for purposes of calculating a majority. This interpretation is problematic because it renders the phrase "in any election" a nullity, and thus violates "the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).

Furthermore, Gutierrez's interpretation requires the phrase "by the casting by each voter of a single vote" to carry more weight than it can support. This phrase merely establishes the requirement that candidates for governor and lieutenant governor run on a single slate. It is the sentence using the phrase "in any election" that establishes the majority requirement and, therefore, that should be accorded greater weight. The better interpretation is that Congress intended "votes cast" to constitute the votes cast for *any* of the offices up for election at that general election; that is, the number of ballots cast.[5]

Our interpretation is buttressed by a comparison of § 1422 to 48 U.S.C. § 1712, which provides for the election of a delegate from Guam to the United States Congress. *See* 48 U.S.C. § 1712 (1987). In contrast to § 1422, § 1712 expressly requires that a candidate receive "a majority of the votes cast for the office of Dele-

---

**5.** Gutierrez argues that this interpretation of § 1422 is absurd because it would require the victor to receive a majority of the sum of all votes cast for all offices voted on at the election. That is, a candidate would have to receive a majority of the approximately 1 million votes that were cast for all candidates for the various offices. The absurdity of this result strongly suggests that this was not Congress' intent. Our interpretation, however, can give substance to the phrase "in any

election" without requiring this result. "Votes cast" does not necessarily mean individual votes cast for particular candidates. For example, a "vote cast" in an election can be equivalent to a ballot cast on which an individual voted for at least one candidate. Admittedly, this interpretation equates "votes cast" with "ballots cast." However, giving effect to the phrase "in any election" in such a way as to avoid an absurdity is preferable to reading the phrase out of the statute entirely.

gate." Section 1712 provides in relevant part:

> The Delegate shall be elected at large, by separate ballot and by *a majority of the votes cast for the office of Delegate.* If no candidate receives such majority, on the fourteenth day following such election a runoff election shall be held between the candidates receiving the highest and the second highest number of votes cast for the office of Delegate.

*Id.* (emphasis added). If Congress had intended a gubernatorial slate to require only a majority of the votes cast for governor and lieutenant governor, presumably, it would have used language similar to that used in § 1712. Furthermore, given the fact that § 1422 and § 1712 involve the closely-related subjects of the election of Guam's governor, lieutenant governor, and delegate to Congress, it can be inferred that, by employing such clearly different language, Congress intended to depart from the scheme fashioned in § 1422, when it enacted § 1712 four years later.

In sum, the text of § 1422 and the differences between it and § 1712 make clear that "a majority of the votes cast in any election" means that a gubernatorial slate must receive a majority of all votes cast in the general election, whether they be, with respect to the gubernatorial race, undervotes, overvotes, write-in votes, or votes for one of the slates.

The parties make a number of additional arguments in support of and against this interpretation. Although these arguments neither compel this interpretation nor call it into question, we address each in turn.

## B. Legislative History

Legislative history does not shed much light on the proper interpretation of § 1422. The portion of § 1422 at issue in this case was added in 1968 by the Guam Elective Governor Act. *See* Guam Elective Governor Act, Pub.L. No. 90–497, 82 Stat.

842 (1968). The House Report accompanying the Act merely summarizes the relevant statutory language without explaining Congress' choice of words. *See* H.R.Rep. No. 90–1521 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3564.

Gutierrez would have us adopt the construction given § 1422 by the House of Representatives in its adjudication of an election contest for the office of the Guam delegate to the House arising from the Guam general election in 1984. The Guam Election Commission certified Ben Blaz the winner after he received 354 more votes than Antonio Won Pat. *See* H.R.Rep. No. 99–220, at 2 (1985). In doing so, the Election Commission did not include overvotes or undervotes in its tabulation of the majority. Won Pat filed a contest of the election with the House of Representatives in part on the basis that Blaz had not received a "majority of the votes cast" as required by § 1712 because the overvotes and undervotes should have been included. *See id.* at 2, 4. The House dismissed the election contest after concluding that undervotes should not have been included because: (1) under the Guam Election Commission's interpretation of Guam election law, blank ballots deposited in the ballot box should be treated no differently than blank ballots returned to a polling official for cancellation; and (2) the Third Circuit's decision in *Todman v. Boschulte,* 694 F.2d 939 (3d Cir.1982), which held that blank ballots should not be counted in determining a majority in the Virgin Islands gubernatorial election, "enjoys general acceptance in jurisdictions governed by statutory provisions similar or identical to Guam's." *Id.* at 4.[6]

We reject the argument that the House's resolution of this election contest should guide our interpretation of § 1422. The most important reason for rejecting that election contest as precedent is that,

---

6. The House of Representatives did not reach the merits of Won Pat's claim that overvotes should have been included because their in-

clusion would not have changed the result in light of the decision to exclude undervotes. *See* H.R. Rep. 99–220, at 5.

despite the House Report's suggestions to the contrary,[7] § 1712 is drafted very differently than § 1422. As discussed above, § 1712 expressly defines the relevant majority for the election of the Guam delegate: "The Delegate shall be elected at large, by separate ballot and by a majority of the votes cast *for the office of Delegate*." § 1712 (emphasis added). Therefore, § 1712's text clearly excludes undervotes, because such ballots do not cast a vote for this particular office. In contrast, § 1422 requires "a majority of the votes cast *in any election*." § 1422 (emphasis added). At the very least, the text of § 1422 leaves open the possibility that undervotes should be included.

■ Additionally, we reject the House election contest as precedent in light of established principles of statutory construction. First, the election contest came 17 years after Congress enacted the language in question in § 1422. The Supreme Court has cautioned that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (internal quotation marks omitted) (citation omitted).

> Such history does not bear strong indicia of reliability ... because as time passes memories fade and a person's perception of his earlier intention may change. Thus, even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.

*Id.* at 118 n. 13, 100 S.Ct. 2051. Second, even if subsequent legislative history is useful and resolution of an election contest qualifies as legislative history, the contest

was adjudicated only by the House of Representatives, not the Senate—both of which were required to enact the relevant language in § 1422.

In sum, we find nothing in the legislative history that suggests a different interpretation of § 1422 than that suggested by its text.

## C. The Todman Decision

Gutierrez argues that we should follow the Third Circuit's decision in *Todman*, in interpreting § 1422. In *Todman*, the court held that undervotes should not be counted in determining whether a candidate for governor of the Virgin Islands received a majority of the votes cast under 48 U.S.C. § 1591. *See* 694 F.2d at 940. The text of § 1591, which provides for the election of the governor and lieutenant governor of the Virgin Islands, is identical to that of § 1422. We respectfully decline to follow *Todman*, however, because it does not provide a more persuasive interpretation of the relevant statutory language than that gleaned from our own textual analysis of § 1422.

*Todman*'s discussion of the merits embraced the reasoning of a decision by the District Court of the Virgin Islands:

> In reaching this conclusion, we note that in *Euwema v. Todman*, [323 F.Supp. 167 (D.Vi.1971)], Judge Almeric Christian stated that "the proper basis for computing a majority" was that "voters not attending the election or not voting on the matter submitted are presumed to assent to the expressed will of those attending and voting and are not to be taken into consideration in determining the result." We agree with this statement of the law.

*Todman*, 694 F.2d at 941. Despite this language, however, we note that *Euwema* does not compel the result reached in *Tod-*

---

7. For example, the House Report notes that "[s]imilar Federal statutory language governs the election of Governors and non-voting Delegates from each of the Territories." H.R.Rep. No. 99–220, at 3. The Report also

describes *Todman*, which involved a statute identical to § 1422, as addressing "the identical issue" as that posed by the election contest based on § 1712. *Id.* at 4.

*man.* There were two issues in *Euwema:* (1) whether a referendum on whether to lower the voting age in the Virgin Islands was a special election or part of the general election held the same day, *see* 323 F.Supp. at 168–69; and (2) whether the phrase "a majority of the qualified voters in the Virgin Islands" meant a majority of the citizens qualified to vote or a majority of the citizens who actually voted, *id.* at 169, 171. The first issue was important because there was a discrepancy between the relevant federal statute and the Virgin Islands statute as to whether the required majority was of the votes cast only on the referendum or of the votes cast at the entire general election. In deciding that the Virgin Islands statute was void to the extent that it conflicted with the federal statute, the court characterized as settled law the principle that, for *general* elections, a "proposition is not carried by a majority of the votes cast therefor unless such majority is also a majority of all votes cast at the election." *Id.* at 170 (citing authorities from a number of states) (internal quotation marks omitted) (citations omitted). Because the referendum in question was found not to be part of the general election, this general rule did not apply. *See id.* at 170–71.

The language cited by *Todman* was taken from *Euwema*'s discussion of the second issue: whether "a majority of the qualified voters" meant a majority of the citizens of the Virgin Islands qualified to vote or a majority of the citizens who actually voted. The *Euwema* court came to the unremarkable conclusion that qualified voters who fail to go to the polls are not included in the base count in determining whether the referendum received a majority:

In the absence of a statutory provision to the contrary, voters not attending the election or not voting on the matter submitted are presumed to assent to the expressed will of those attending and voting and are not to be taken into consideration in determining the result.... [A]lthough there are cases that point to a contrary conclusion, generally the term "qualified voter" in a provision as to the proportion of voters necessary for the adoption of a measure refers, not to those qualified and entitled to vote, but to those qualified and actually voting.

*Euwema,* 323 F.Supp. at 171 (quoting what is now 26 Am.Jur.2d Elections § 406 (1996)).

We, therefore, draw a different conclusion from *Euwema* than did the *Todman* court—that ballot propositions that require a majority of the votes cast and are part of a general rather than a special election typically require a majority of all votes cast at the general election—not just the votes cast on the particular initiative.[8]

### D. Case Law at the Time of § 1422's Enactment

Gutierrez contends that § 1422's interpretation is governed by *County of Cass v. Johnston,* 95 U.S. (5 Otto) 360, 24 L.Ed. 416 (1877), which, Gutierrez argues, stands for the proposition that voters who do not express a preference in a particular race defer to the choice of those who do:

This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election

---

**8.** Furthermore, despite the House of Representatives' assertion to the contrary, *see* H.R.Rep. No. 99–220, at 4, there is no indication that *Todman* has gained general acceptance in other jurisdictions. *Todman* has been cited in only three cases, only one of which actually relied on *Todman* instead of on the underlying district court opinion, which *Todman* reversed on other grounds.

See *Stapleton v. Board of Elections,* 821 F.2d 191, 193 (3d Cir.1987) (discussing district court case); *Democratic Party of the Virgin Islands v. Board of Elections,* 649 F.Supp. 1549, 1551–52 (D.Vi.1986) (same); *Republican Party of Hawaii v. Waihee,* 68 Haw. 258, 709 P.2d 980, 981 (1985) (noting *Todman*'s holding that blank ballots are not "votes cast").

duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares.

*Id.* at 369. *Cass*, however, is not as expansive as Gutierrez contends and is not controlling for the same reasons that we do not find the *Todman* court's reliance on this language persuasive.[9] First, *Cass* addresses the issue of whether qualified voters who do not go to the polls should be included when calculating a majority. *See id.*, 95 U.S. (5 Otto) at 365. Qualified voters who did not participate in the Guam election are not at issue in this case. Second, *Cass* expressly notes that this principle applies only in the absence of a statutory provision to the contrary. *See id.*, 95 U.S. (5 Otto) at 369. As discussed above, we believe that § 1422 provides such direction.

Ada points to state court decisions interpreting language similar to that used in § 1422 as requiring a majority of all votes cast at an election. For example,

> [i]t is the general rule that when a proposition is required to carry by a majority *of the votes cast* at a certain election the proposition must receive the favorable vote of a majority of all valid votes cast at the election, as distinguished from the votes on a particular question. Califor-

nia has been classed among the majority holding to this construction.

*People ex rel. Smith v. City of Woodlake,* 41 Cal.App.2d 119, 122–23, 106 P.2d 71 (1940).[10]

Ada argues that this case law is relevant because we should assume that Congress acted against the background of these judicial interpretations when it enacted § 1422. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meanings of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word...."); *Miller v. Commissioner of Internal Revenue,* 836 F.2d 1274, 1282 (10th Cir.1988) ("[W]hen Congress uses a term of art which has received a consistent judicial interpretation, there is a heavy presumption that Congress and the President have incorporated the prior meaning.").

We find these state law cases to be of limited value. Not only did many of the cases predate the enactment of § 1422 by a number of years, but each turns on the specific language of the governing statutory provision in question. Furthermore, a number of cases reach a different result.[11] Therefore, these cases do not establish a

---

9. This language is virtually identical to that quoted in *Todman,* 694 F.2d at 941, and *Euwema,* 323 F.Supp. at 171.

10. *See also City of Santa Rosa v. Bower,* 142 Cal. 299, 301–02, 75 P. 829 (Cal.1904) (requiring "a majority of ... qualified electors voting thereat"); *People v. West Side County Water Dist.,* 112 Cal.App.2d 228, 231–33, 246 P.2d 119 (Cal.Ct.App.1952) (requiring "a majority of the votes cast at the election"). The Supreme Court of Nebraska reached the same conclusion after an extensive analysis of case law from other jurisdictions. *See Thurston County Farm Bureau v. Thurston County,* 136 Neb. 575, 287 N.W. 180, 185–88 (1939). The *Thurston County* court went so far as to conclude, "[t]he rule announced in these decisions is too firmly established to be further questioned in this state." *Id.* at 188.

11. For example, in *Alaska Native Ass'n of Oregon v. Morton,* 417 F.Supp. 459 (D.D.C. 1974), the court noted that "a majority is determined on the basis of those voting on the particular proposition on the ballot, not on the number of ballots cast." *Id.* at 468. Similarly, in *Munce v. O'Hara,* 340 Pa. 209, 16 A.2d 532 (1940), the Supreme Court of Pennsylvania adhered to "what we regard as the better view" that "a majority vote of [a town's] qualified electors cast at any general election" refers to the votes cast on the proposition in question, not on other questions or for candidates for office. *Id.* at 532, 533. *See also Wooley v. Sterrett,* 387 S.W.2d 734, 740 (Tex.Civ.App.1965) (following rule enunciated in *Munce* ); *Hawaii State AFL–CIO v. Yoshina,* 84 Hawai'i 374, 935 P.2d 89, 98 (1997) (holding that "a majority of the ballots cast upon such a question" includes blank ballots and overvotes).

rule that is equivalent to a term of art encapsulating well-established judicial precedent such that Congress surely must have intended to incorporate its meaning when it enacted § 1422; these cases support our interpretation of § 1422, but do not compel it.

### E. Guam Election Law

■ Gutierrez argues that Guam election law precludes the inclusion of undervotes and overvotes in the computation of the votes cast because 3 Guam Code Ann. § 11114 provides that ballots for which it is impossible to determine the voter's choice should not be counted in the race for that office. Section 11114 states that, in the event that a voter indicates

> the choice of more than there are candidates to be elected or certified for any office, or if for any reason it is impossible to determine his choice for any office, his ballot shall not be counted for that office, but the rest of his ballot, if properly marked, shall be counted.

3 Guam Code Ann. § 11114 (1998). Section 11114, however, establishes only that invalid votes and blank votes are not counted in favor of any candidate for the office for which they are invalid or blank. It does not preclude those ballots from being counted as "votes cast" for purposes of determining a majority. In fact, § 11114 expressly provides that these ballots are still valid for purposes of other races in the election.[12] We thus conclude that Guam election law does not shed any additional light on the proper interpretation of § 1422.[13]

### F. Policy Considerations

■ Finally, Gutierrez argues that it is nonsensical to require a runoff election when there were only two gubernatorial slates in the election and even more so because Gutierrez would have received a majority of the votes validly cast even if all of the write-in votes had gone to Ada. There is a good deal of appeal to this contention. The fact that a runoff election seems superfluous in this particular instance, however, does not strip the runoff requirement of all justification. For example, as Ada points out, Congress' purpose in its choice of language in § 1422 may have been to confer on the victors the greater legitimacy of having received more than 50 percent of the votes of all voters participating in the election. Furthermore, Congress obviously was aware of the strong two-party tradition in this country when it adopted § 1422's majority requirement and, therefore, could have predicted that two-slate dominance was a likely occurrence. The argument that a new election will not change the old should be made to Congress and not the courts. Thus, despite the various policy arguments for or against allowing a seemingly indifferent minority to force a runoff, the language Congress chose when it enacted § 1422 requires such a result.

### IV.

Section 1422's requirement that a gubernatorial slate secure "a majority of the votes cast in any election" to win is better interpreted as requiring a gubernatorial slate to garner a majority of the votes cast in the general election, rather than only in the gubernatorial race, if we are to give force to the words chosen by Congress. The Guam Election Commission should have included undervotes and overvotes in the total number of votes cast. As a re-

---

12. The same is true for 3 Guam Code Ann. § 11111, which provides in relevant part that "[a]t any election, any ballot which is not marked as provided by law shall be void; but the ballot shall be preserved." 3 Guam Code Ann. § 11111 (1998). The fact that a particular vote on a ballot is invalid does not mean that the ballot should not be counted in determining a majority.

13. Even if Guam election law contradicted our interpretation of § 1422, Guam law would not control because Guam law cannot trump conflicting federal law. See Euwema, 323 F.Supp. at 170 (invalidating Virgin Islands election statute to the extent that it contradicted federal election statute).

sult, the Gutierrez slate failed to secure a majority of the votes cast, necessitating a runoff election between the Gutierrez and Ada slates.

Because the district court did not base its decision on an incorrect legal standard, it did not abuse its discretion in issuing a writ of mandamus. Accordingly, the order of the district court is AFFIRMED and this case is REMANDED to the district court for further proceedings.[14] The emergency stay issued on December 15, 1998, is dissolved.

---

**14.** We leave it to the district court, in its discretion and after hearing from the parties, to determine whether it should set the date of the runoff election or require the Guam Election Commission to do so.

