GUTIERREZ ET AL. *v.* ADA ET AL.

No. 99–51.   Argued December 6, 1999—Decided January 19, 2000

SOUTER, J., delivered the opinion for a unanimous Court.

*Seth M. Hufstedler* argued the cause for petitioners. With him on the briefs were *Shirley M. Hufstedler, Diane E. Pritchard,* and *F. Philip Carbullido.*

*Dennis P. Riordan* argued the cause for respondents. With him on the brief were *Donald M. Horgan, Dylan L. Schaffer, Robert H. Bork,* and *Curtis Charles Van De Veld.** 

JUSTICE SOUTER delivered the opinion of the Court.

The question here is whether the statute governing elections for Governor and Lieutenant Governor of the Territory of Guam compels a runoff election when a candidate slate has received a majority of the votes cast for Governor and Lieutenant Governor, but not a majority of the number of ballots cast in the simultaneous general election. We hold that the statute requires no runoff.

## I

In the November 3, 1998, Guam general election, petitioners Carl T. C. Gutierrez and Madeleine Z. Bordallo were can-

---

*\*William J. Carter* and *M. Miller Baker* filed a brief for the Voting Integrity Project as *amicus curiae* urging reversal.

didates running on one slate for Governor and Lieutenant Governor, opposed by the slate of respondents Joseph F. Ada and Felix P. Camacho. Gutierrez received 24,250 votes, as against 21,200 for Ada. *Ada* v. *Guam,* 179 F. 3d 672, 675 (CA9 1999); App. 16. One thousand two hundred and ninety-four voted for write-in candidates; 1,313 persons who cast ballots did not vote for either slate or any write-in candidate; and 609 voted for both slates. 179 F. 3d, at 675; App. 16. The total number of ballots cast in the general election was thus 48,666, and the Gutierrez slate's votes represented 49.83 percent of that total. The Guam Election Commission certified the Gutierrez slate as the winner, finding it had received 51.21 percent of the vote, as calculated by deducting the 1,313 ballots left blank as to the gubernatorial election from the total number of ballots cast. 179 F. 3d, at 675. Respondents Ada and Camacho sued in the United States District Court for a writ of mandamus ordering a runoff election, contending that Gutierrez and Bordallo had not received a majority of the votes cast, as required by the Organic Act of Guam, 64 Stat. 384, as amended, 48 U. S. C. § 1421 *et seq.* (1994 ed. and Supp. III).

So far as relevant, the Organic Act provides that:

> "[t]he executive power of Guam shall be vested in an executive officer whose official title shall be the 'Governor of Guam'. The Governor of Guam, together with the Lieutenant Governor, shall be elected by a majority of the votes cast by the people who are qualified to vote for the members of the Legislature of Guam. The Governor and Lieutenant Governor shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices. If no candidates receive a majority of the votes cast in any election, on the fourteenth day thereafter a runoff election shall be held between the candidates for Governor and Lieutenant Governor receiving the highest and second highest number of votes cast. The first election for Governor and Lieutenant

Governor shall be held on November 3, 1970. Thereafter, beginning with the year 1974, the Governor and Lieutenant Governor shall be elected every four years at the general election. The Governor and Lieutenant Governor shall hold office for a term of four years and until their successors are elected and qualified." 48 U. S. C. § 1422.

Respondents' position boils down to the claim that the phrase "majority of the votes cast in any election" requires that a slate of candidates for Governor and Lieutenant Governor receive a majority of the total number of ballots cast in the general election, regardless of the number of votes for all gubernatorial slates by those casting ballots. If this is the correct reading of the phrase, the parties agree that a runoff was required. If, however, the phrase refers only to votes cast for gubernatorial slates, no runoff was in order, and petitioners were elected Governor and Lieutenant Governor.

The United States District Court for the District of Guam read the statute to require a majority of the total number of voters casting ballots in the general election and so ruled that the Gutierrez slate had not received "a majority of the votes cast in any election." The court accordingly issued a writ of mandamus for a runoff election to be held on December 19, 1998, *Ada* v. *Guam*, No. Civ. 98–00066 (Dec. 9, 1998), App. to Pet. for Cert. A–25, A–55.

Although the Court of Appeals for the Ninth Circuit issued an emergency stay of the District Court's order pending appeal, 179 F. 3d, at 676, it ultimately affirmed. The Court of Appeals understood the reference to "majority of the votes cast" as meaning "all votes cast at the general election, for Congress presumably would not have included the phrase 'in any election,' if it meant to refer only to the votes cast in the single election for governor and lieutenant governor." *Id.*, at 677. The court thought that any other reading would render the phrase "in any election" a "nullity." *Ibid.* The Court of Appeals also relied on a comparison of § 1422 with

48 U. S. C. § 1712, which provides that a candidate for Guam's Delegate to Congress must receive "a majority of the votes cast for the office of Delegate" in order to be elected. The Ninth Circuit reasoned that Congress could have used similar language of limitation if it had intended the election of a Governor and Lieutenant Governor to require only a majority of votes cast for gubernatorial slates. 179 F. 3d, at 678. The Ninth Circuit stayed its mandate pending disposition of petitioners' petition for a writ of certiorari.

We granted certiorari, 527 U. S. 1063 (1999), to resolve a split between the Ninth Circuit's interpretation of the Organic Act of Guam and the Third Circuit's reading of identical language in the Revised Organic Act of the Virgin Islands. See 68 Stat. 503, as amended, 48 U. S. C. § 1591 (providing for a runoff election for Governor and Lieutenant Governor of the Virgin Islands "[i]f no candidates receive a majority of the votes cast in any election"); *Todman* v. *Boschulte,* 694 F. 2d 939 (CA3 1982). We reverse.

## II

The key to understanding what the phrase "in any election" means is also the most salient feature of the provision in which it occurs. The section contains six express references to an election for Governor and Lieutenant Governor: "The Governor of Guam, together with the Lieutenant Governor, shall be elected . . ."; "[t]he Governor and Lieutenant Governor shall be chosen jointly, by the casting by each voter of a single vote . . ."; "a runoff election shall be held between the candidates for Governor and Lieutenant Governor . . ."; "[t]he first election for Governor and Lieutenant Governor shall be held . . ."; "the Governor and Lieutenant Governor shall be elected every four years . . ."; "[t]he Governor and Lieutenant Governor shall hold office . . . until their successors are elected . . . ." 48 U. S. C. § 1422. The reference to "any election" is preceded by two references to gubernatorial election and followed by four. With "any election" so

surrounded, what could it refer to except an election for Governor and Lieutenant Governor, the subject of such relentless repetition? To ask the question is merely to apply an interpretive rule as familiar outside the law as it is within, for words and people are known by their companions. See *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995) ("[A] word is known by the company it keeps"); *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961) ("The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress"). Cf. *Foster* v. *Love*, 522 U. S. 67, 71 (1997) ("When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder (subject only to the possibility of a later run-off . . . )").

Other clues confirm that Congress did not shift its attention when it used "any election" unadorned by a gubernatorial reference or other definite modifier. Later on in the same provision, Congress did vary the specific modifier when it spoke of the "general election" at which the gubernatorial election would occur; it is thus significant that Congress did not peg the majority-vote requirement to "votes cast in any [general] election." Congress would hardly have used "any election" to mean "general election," only to mention "general election" a few lines further on.

It would be equally odd to think that after repeatedly using "votes" or "vote" to mean an expression of choice for the gubernatorial slate, Congress suddenly used "votes cast in any election" to mean "ballots cast." And yet that is just what would be required if we were to treat the phrase respondents' way, for they read "votes cast in any election" as referring to "ballots containing a vote for any office." Surely a Congress that meant to refer to ballots, midway through a statute repeatedly referring to "votes" for guber-

natorial slates, would have said "ballots." To argue otherwise is to tag Congress with an extravagant preference for the opaque when the use of a clear adjective or noun would have worked nicely. But even aside from that, Congress has shown that it recognizes the difference between ballots and votes in the very context of Guamanian elections. From 1972 until 1998, 48 U. S. C. § 1712 expressly required that the Guam Delegate be elected "by separate ballot and by a majority of the votes cast for the office of Delegate." There is simply no reason to think that Congress meant "ballots" when it said "votes" in § 1422.

To accept respondents' reading would also impute to the Congress a strange preference for making it hard to select a Governor. On respondents' reading the statute could require a runoff (as it would in this case) even though one slate already had a majority of all those who cared to make any choice among gubernatorial candidates. Respondents try to counter the unreality of their position by emphasizing state cases holding that passing a referendum requires a majority of voters going to the polls, not a mere majority of persons voting on a particular referendum issue. Cf. *Allen* v. *Burkhart*, 377 P. 2d 821 (Okla. 1963); *Thurston County Farm Bureau* v. *Thurston County*, 136 Neb. 575, 287 N. W. 180 (1939); *Missouri* v. *Winkelmeier*, 35 Mo. 103 (1864). But there is no uniform rule, see, *e. g., Wooley* v. *Sterrett*, 387 S. W. 2d 734, 739–740 (Tex. Civ. App. 1965); *Munce* v. *O'Hara*, 340 Pa. 209, 16 A. 2d 532 (1940); *State ex rel. Short* v. *Clausen*, 72 Wash. 409, 130 P. 479 (1913), and even if there were, treatment of referendums would not be a plausible model for elections of officials. Referendums are exceptions to the normal legislative process, and passage of a referendum is not itself essential to the functioning of government. If a ballot-majority requirement makes it impossible to pass a referendum measure, nothing need be done except record the failure. The same requirement to elect an official, on the other hand, would necessitate further action, the trouble and ex-

pense of which would not make any apparent sense when those who expressed any preference among candidates had already given a majority to one of them.

As a final confirmation of the obvious reading, we note that requiring a majority of the total number of voters on election day would be in some tension with § 1422a, which provides for recall elections for Governor and Lieutenant Governor. Section 1422a(b) provides that "[a]ny Governor, Lieutenant Governor, or member of the legislature of Guam may be removed from office by a referendum election in which at least two-thirds of the number of persons voting for such official in the last preceding general election at which such official was elected vote in favor of recall and in which those so voting constitute a majority of all those participating in such referendum election." The recall provision thus looks to the total number of persons who actually voted for Governor, not the total number who went to the polls. In a rational world, we would not expect the vote required to oust a Governor to be pegged to a lower number than it would take to elect one.

If all these considerations confirm the reading according to the rule of meaning by association, respondents nevertheless emphasize two considerations said to point the other way. First, as we noted before, § 1712 includes a specific statement that "a majority of the votes cast for the office of Delegate" is necessary and presumably sufficient to elect a Delegate. Without a comparably clear modifier in § 1422 referring to votes sufficient to elect gubernatorial slates, respondents argue, "a majority of the votes cast in any election" must refer to a majority of all those voting for any office. But the drafting difference supports no such inference. Congress adopted the language in § 1712 four years after enacting the phrase at issue in this case, and there is no affirmative indication in § 1712 that Congress gave any thought to differentiating the terms of Delegate and gubernatorial elections. Hence, as we have said before, later laws that "do not

seek to clarify an earlier enacted general term" and "do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute," are "beside the point" in reading the first enactment. *Almendarez-Torres* v. *United States*, 523 U. S. 224, 237 (1998). Congress may have spoken with explicit clarity when it passed § 1712, but we can say no more than that.

The second argument supposedly undermining the meaning naturally suggested by association was stressed by the Court of Appeals, which thought that reading "any election" to mean gubernatorial election would render the phrase a nullity and thus offend the rule against attributing redundancy to Congress, see *Kungys* v. *United States*, 485 U. S. 759, 778 (1988). The fact is that this argument has some force, but not enough. There is no question that the statute would be read as we read it even if the phrase were missing. But as one rule of construction among many, albeit an important one, the rule against redundancy does not necessarily have the strength to turn a tide of good cause to come out the other way. Besides, there is even a reason for thinking the phrase in question has some clarifying value. Section 1422 provides specifically for an initial gubernatorial election in 1970, and generally for successive elections every four years thereafter. "[A]ny election," therefore, may be read to make it clear that the runoff requirement applies equally to the initial election and to those periodically scheduled in the future. That may not be very heavy work for the phrase to perform, but a job is a job, and enough to bar the rule against redundancy from disqualifying an otherwise sensible reading.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*