*303 Justice Sotomayor,
with whom Justice Breyer joins, dissenting.
The False Claims Act (FCA) divests federal courts of jurisdiction to hear qui tam lawsuits based on allegations or transactions publicly disclosed in a “congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation,” unless the qui tam relator is an “original source” of the information. 31 U. S. C. § 3730(e)(4)(A) (footnote omitted). Today, the Court reads the phrase “administrative . . . report, hearing, audit, or investigation” to encompass not only federal, but also state and loeal, government sources. In my view, the Court misreads the statutory text and gives insufficient weight to contextual and historical evidence of Congress' purpose in enacting § 3730. I would affirm the judgment of the Court of Appeals and hold that “administrative” in the above-quoted provision refers only to Federal Government sources.[1]
I
Section 3730(e)(4)(A) sets forth three categories of “public disclosure[s]” that trigger the FCA's jurisdictional bar: “allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or [3] from the news media.”[2] (Like the majority, I have inserted Arabic numerals and refer to the three phrases as “Categories.”) “It is *304 a ‘fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.’ ” FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 133 (2000) (quoting Davis v. Michigan Dept, of Treasury, 489 U. S. 803, 809 (1989)). No party here disputes that “congressional” and “[GAO]” refer only to Federal Government sources. Ante, at 287, and nn. 5-6. As the Court acknowledges, ante, at 286-287, the word “administrative” is more capacious, potentially reaching not only federal, state, and local government sources but also disclosures by private entities. See, e. g., Black’s Law Dictionary 42 (5th ed. 1979) (defining “administrative” as “pertaining] to administration, especially management,... [of] the execution, application or conduct of persons or things”).
Like the Court of Appeals, I view Congress’ choice of two “clearly federal terms [to] bookend the not-so-clearly federal term” as a “very strong contextual cue about the meaning of ‘administrative.’ ” 528 F. 3d 292, 302 (CA4 2008). “ ‘The maxim hoscitur a sociis, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.’” Gutierrez v. Ada, 528 U. S. 250, 255 (2000) (quoting Jarecki v. G. D. Searle & Co., 367 U. S. 303, 307 (1961)). Here, the immediate proximity of “congressional” and “[GAO]” suggests that “administrative” should be read, like its neighbors, as referring to Federal Government sources. If Congress had intended to include state or local government administrative materials, it could have said so, for instance by referring generieally to “governmental” sources. See 528 F. 3d, at 304-305.
The Court applies the logic that underlies the noscitur a sociis canon in concluding that “administrative” does not refer to private entities because of the meaning suggested by the slightly more distant neighbors “report, hearing, audit, or investigation.” See ante, at 286-287. I agree *305 with the majority that “administrative” in this context does not reach private entities. But in my view, “congressional” and “[GAO]” provide the better textual grounding for that conclusion. I see no reason why the “administration]” of a private university, for instance, could not issue a “report,” order an “audit” or “investigation,” or conduct a “hearing.” Nor, contrary to the majority’s suggestion, are private entities — particularly those receiving federal funds or participating in federal programs — incapable of making “public disclosure[s]” of fraud on the Federal Government.
Despite its own implicit reliance on the canon, the Court nevertheless rejects the Court of Appeals’ application of noscitur a sociis to interpret the three terms in Category 2, concluding that “[a] list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating.” Ante, at 288. The three terms in Category 2, the Court concludes, are “too few and too disparate” to justify invocation of noscitur a sociis. Ante, at 289. We have not previously constrained the canon in this way, and I would not do so here.
To take just one example, in Jarecki we construed the statutory term “ ‘abnormal income,’ ” which the statute defined to include income resulting from “ ‘exploration, discovery, or prospecting.’ ” 367 U. S., at 304-305 (quoting § 456(a) of the Internal Revenue Code of 1939). Recognizing that the word “‘[discovery’” is “usable in many contexts and with various shades of meaning,” we observed that it “gathers meaning from the words around it” and concluded that “[t]he three words in conjunction ... all describe income-producing activity in the oil and gas and mining industries.” Id., at 307. As a result, and in light of other contextual evidence supporting the same conclusion, we held that sales of newly invented drugs or camera equipment did not give rise to “abnormal income” even if such inventions might otherwise be understood as “discoveries].” See id., at 307-313. In my view, the three terms in Category 2 are no more “dis *306 tinct” or “disparate,” ante, at 288,289, than the phrase at issue in Jarecki, particularly given the expansive plain meaning of “discovery.” Cf. ante, at 289, n. 7. Here, application of the noscitur a sociis principle readily yields a common feature: The sources at issue are federal in nature, not related to state or local governments or private entities. See Third Nat. Bank in Nashville v. Impac Limited, Inc., 432 U. S. 312, 322-323, 315 (1977) (applying principle that “words grouped in a list should be given related meaning” where term “ ‘injunction’ ” was “sandwiched” between two other words in the statutory phrase “‘attachment, injunction, or execution’”).[3]
The Court draws additional support for its conclusion from reference to the provision’s “larger scheme,” ante, at 289— i. e., the sources enumerated in Categories 1 and 3. Although the scope of Category 1 is not before us today (and although this Court has never addressed that question), the Court believes that reading Category 2 as limited to Federal Government sources would be inconsistent with decisions of lower *307 courts that have interpreted “criminal, civil, or administrative hearing[s]” in Category 1 to include both state and federal proceedings. There is no conflict, however, if both categories are read, as respondent and the Solicitor General urge, as exclusively federal. See Brief for Respondent 23-24; Brief for United States as Amicus Curiae 25-26. Even reading Category 1 more broadly, however, does not change the exclusively federal nature of “congressional” and “[GAO],” which undermines whatever inference might be drawn from taking the statutory terms in strict succession. Treating the entirety of § 3730(e)(4)(A) as an undifferentiated list of items gives short shrift to the syntactical choices Congress made in offsetting each category with commas and prepositions, and in providing distinct classes of adjectives that modify different nouns.
Finally, the Court also views “news media” as “distinctly nonfederal in nature.” Ante, at 290. But “news media” does not seem particularly illuminating in this context. As the Court of Appeals observed, although media sources may be national or local in scope, that distinction is not analogous to the difference between federal and state government sources. 528 F. 3d, at 304.
II
In my view, the statutory context and legislative history are also less “opaque,” cf. ante, at 298, and more supportive of the reading adopted by the Court of Appeals, than the majority today acknowledges. While the legislative record is concededly incomplete, it does provide reason to exercise caution before giving the statutory text its broadest possible meaning — i. e., to encompass not only federal, but also state and local, government sources.
Three points are particularly salient. First, prior to the 1986 amendments, the “Government knowledge” bar unquestionably referred only to information in the possession of the *308 Federal Government.[4] Even still, the bar was criticized as overly restrictive. A Senate Report on an initial version of the 1986 legislation, for instance, described the FCA’s history and need for legislative reform, noting “several restrictive court interpretations of the act... which tend to thwart the effectiveness of the statute.” S. Rep. No. 99-345, p. 4 (1986) (hereinafter S. Rep.). For instance, courts had applied the Government knowledge bar “even if the Government makes no effort to investigate or take action after .. . original allegations [a]re received.” Id., at 12 (citing United States ex rel. Lapin v. International Business Machines Corp., 490 F. Supp. 244 (Haw. 1980)).[5]
Second, there is more support than the Court recognizes for the proposition that Congress sought in the 1986 amendments to broaden the availability of qui tam relief. The Senate Report characterized the reform effort as intended to “enhance the Government’s ability to recover losses sustained as a result of fraud against the Government” and dwelt at length on the “severe” and “growing” problem of “fraud in Federal programs.” S. Rep., at 1-2; accord, H. R. *309 Rep. No. 99-660, p. 18 (1986) (“Evidence of fraud in Government programs and procurement is on a steady rise”). The Senate Report also articulated a desire to “encourage any individual knowing of Government fraud to bring that information forward,” and it identified as “perhaps the most serious problem plaguing effective enforcement [of antifraud laws] a lack of resources on the part of Federal enforcement agencies.” S. Rep., at 2, 7.[6]
Consistent with these expressed views, the enacted legislation was replete with provisions encouraging qui tam actions. By replacing the Government knowledge bar with the current text of § 3730(e)(4)(A) and including an exception for “original source[s],” Congress “allowed private parties to sue even based on information already in the Government’s possession.” Cook County v. United States ex rel. Chandler, 538 U. S. 119, 133 (2003). The 1986 amendments also established the right of qui tam relators to continue as a party to a suit after the Government intervenes, 31 U. S. C. § 3730(c)(1) (1988 ed.); increased the percentage of recovery available as an incentive for private suits, § 3730(d)(1); and created a cause of action against employers who retaliate against qui tam relators, § 3730(h).[7]
*310 To be sure, Congress was also concerned in 1986, as in 1943, with guarding against purely opportunistic, “parasitic” qui tam relators. See S. Rep., at 10-11 (describing history of parasitic suits and the 1943 amendments); ante, at 293-295. Lower courts have viewed the 1986 amendments as striking a balance between the “twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.” United States ex rel. Springfield Terminal R. Co. v. Quinn, 14 F. 3d 645, 651 (CADC 1994). But evidence that Congress sought to balance two competing goals supports moderation in interpreting an arguably am *311 biguous statutory text, rather than woodenly reading the statutory language to its fullest possible extent.
Third, the legislative record “ ‘contains no hint of any intention’” to bar suits based on disclosures from state or local government sources. Brief for United States as Amicus Curiae 20 (quoting United States ex rel. Anti-Discrimination Center of Metro N. Y., Inc. v. Westchester Cty., 495 F. Supp. 2d 375, 383 (SDNY 2007)). Inclusion of state or local government sources would have constituted a significant departure from the Federal Government knowledge bar that had existed for four decades by 1986. But neither the initial bills reported by the Senate and House Committees nor statements by individual Members of Congress about subsequent versions of the legislation suggest any consideration or debate about expanding the pre-1986 bar to apply to state or local government sources.[8]
*312 Although these points do not definitively resolve the question presented today, to my mind they counsel against reading § 3730(e)(4)(A) (2006 ed.) so broadly as to disturb the balance Congress evidently sought to achieve through the 1986 amendments. Today’s decision risks such a result. The Court imposes a jurisdictional bar that is by all appearances more restrictive, of qui tarn suits than the pre-1986 regime. Construing § 3730(e)(4)(A) to encompass the thousands of state and local government administrative reports produced each year effectively imputes to the Federal Government knowledge of such sources, whether or not the Government is aware of the information or in a position to act on it.[9] The Solicitor General specifically warns that while information in federal administrative audits or investigations is “readily available” to attorneys at the Department of Justice, “many state and local reports and investigations never come to the attention of federal authorities.” Brief for United States as Amicus Curiae 22. The Court dismisses this concern as “sheer conjecture,” postulating that Government lawyers “may” in fact learn about “quite a few” state or local reports and investigations, particularly in joint state-federal programs.[10] Ante, at 299. Perhaps so. But absent any con *313 crete reason to believe otherwise, I would not so readily dismiss the formal representation of the Executive Branch entity with responsibility for, and practical experience in, litigating FCA claims on behalf of the United States.
In sum, the statute’s plain text, evidence of Congress’ intent to expand qui tam actions, and practical consequences of a more expansive interpretation together suggest Category 2 is most reasonably read to encompass federal, but not state or local, government sources.[11]
* * *
For the reasons given above, I would affirm the judgment of the Court of Appeals, and respectfully dissent.

 As the Court notes, recent legislation amended the language of 31 U. S. C. § 3730(e)(4). See ante, at 283, n. 1 (citing Pub. L. 111-148, § 10104(j)(2), 124 Stat. 901). Like the Court, I use the present tense throughout this opinion in discussing the statute as it existed at the time this case was argued before this Court.

 As the Court observes, in enacting § 3730(e)(4)(A) Congress erroneously referred to the General Accounting Office — now renamed the Government Accountability Office — as the “Government Accounting Office,” Ante, at 287, n. 6.

 The Court relies on Reiter v. Sonotone Corp., 442 U. S. 330, 338-339 (1979), for the proposition that we should not ‘“rob”' any of the three terms in Category 2 of 31 U. S. C. § 3730(e)(4)(A) of “ ‘its independent and ordinary significance.’ ” Ante, at 288. But Reiter involved the statutory term “business or property.” Those two words less readily suggest a shared limiting principle than do “congressional, administrative, or [GAO].” Moreover, our concern about “rob[bing]” the word ‘“property” of its broader meaning rested on a desire not to “ignore the disjunctive ‘or’ ” in the statutory pairing. 442 U. S., at 338-339; see also id., at 339 (“Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings”). Because Congress did not employ a completely disjunctive list in § 3730(e)(4)(A) — i. e., “congressional or administrative or [GAO]” — the Reiter principle applies with less force. Cf. Garcia v. United States, 469 U. S. 70, 73 (1984) (applying disjunctive principle in construing statutory prohibition on assault and robbery of any custodian of “ ‘mail matter or of any money or other property of the United States,”’ and observing that “[t]he three classes of property ... are each separated by the conjunction ‘or’” (quoting 18 U. S. C. §2114; some emphasis deleted)).

 As originally enacted in 1943, the bar applied to suits “based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.” 57 Stat. 609. In 1982, Congress recodified the provision to apply to suits “based on evidence or information the Government had when the action was brought.” 96 Stat. 979.

 The Senate Report also discussed United States ex rel. Wisconsin (Dept. of Health and Social Servs.) v. Dean, 729 F. 2d 1100 (CA7 1984), in which the court barred Wisconsin from bringing a qui tam suit for Medicaid fraud because the State had previously disclosed the information to the Federal Government, even when the State's own investigation had discovered the fraud. S. Rep., at 12-13. Lower courts have observed that the Dean decision was controversial and appears to have motivated the inclusion of the “original source” exception in the 1986 jurisdictional bar. See, e. g., Wang v. FMC Corp., 975 F. 2d 1412, 1419 (CA9 1992); see also S. Rep., at 13 (noting resolution by the National Association of Attorneys General criticizing Dean and urging Congress to address the problem).

 In introducing a later and near-final version of the bill, Senator Grassley described the reform effort as stemming “from a realization that the Government needs help — lots of help — to adequately protect taxpayer funds from growing and increasingly sophisticated fraud.” 132 Cong. Rec. 28580 (1986); see also United States ex rel. Siller v. Becton Dickinson & Co., Microbiology Systems Div., 21 F. 3d 1339, 1347 (CA4 1994) (“By 1986, when section 3730(e)(4) was enacted, Congress had come to the conclusion that fraud against the Government was apparently so rampant and difficult to identify that the Government could use all the help it could get from private citizens with knowledge of fraud” (internal quotation marks omitted)).

 See also 1 J. Boese, Civil False Claims and Qui Tam Actions § 1.04[G], p. 1-22 (Supp. 2007) (“[Virtually all the changes introduced in th[e] section [of the 1986 amendments addressing qui tam actions] expanded the rights of qui tam relators”). The amendments also contained a number of provisions facilitating enforcement generally, e. g., lowering the requisite show *310 ing of intent by making dear that “knowing” violations require “no proof of specific intent to defraud,” 31 U. S. C. § 3729(b)(1) (1988 ed.); lengthening the statute of limitations, § 3731(b); and authorizing treble damages, § 3729(a).
The Court fairly observes that the addition of “news media” to the jurisdictional bar undercuts attributing to Congress a “single-minded” intent to expand the availability of qui tam relief Ante, at 300. But neither does that provision support reading Category 2 to its broadest possible extent. Moreover, barring suits based on "news media” disclosures may not have constituted a particularly significant expansion of existing law. Courts had applied the pre-1986 Government knowledge bar to dismiss actions based on information reported in the news media. In United States ex rel. Thompson v. Hays, 432 F. Supp. 253,256, 255 (DC 1976), the court dismissed a suit based on evidence “gleaned from sources in the news media which received widespread public attention [alleging fraud by a Member of Congress],” when the Department of Justice “first obtained information regarding the claims ... as a result of [a] Washington Post article.” Similarly, the court in United States v. Burmah Oil Co., 558 F. 2d 43, 46, n. 1 (CA2 1977) (per curiam) characterized the Government knowledge bar as “discourag[ing] the filing of actions by parties having no information of their own to contribute, but who merely plagiarized information in indictments returned in the courts, newspaper stories or congressional investigations.” Congress could have reasonably assumed in 1986 that news media would report on the kinds of high-profile frauds that would naturally — perhaps as a result of the reporting — come to the Government’s attention, and thus would already have been covered under existing law

 In June 1986, the House Committee on the Judiciary reported a bill that would have barred qui tam actions based on information “which the Government disclosed as a basis for allegations made in a prior administrative, civil, or criminal proceeding,” “disclosed during the course of a congressional investigation,” or “disseminated by any news media.” H. R. Rep. No. 99-660, pp. 2, 3 (internal quotation marks omitted). The references to information disclosed by the Government itself (with a capital “G”) and to “congressional investigation[s]” connote federal, not state or local, government sources. In July, the Senate Committee on the Judiciary reported its own version of the bill, barring actions “based upon allegations or transactions which are the subject of a civil suit in which the Government is already a party, or within six months of the disclosure of specific information relating to such allegations or transactions in a criminal, civil, or administrative hearing, a congressional or [GAO] report or hearing, or from the news media.” S. Rep., at 43. The reference to suits in which the Federal Government is a party and absence of the ambiguous term “administrative” in the bill's reference to “congressional or [GAO]” reports or hearings, similarly tend to exclude disclosures from state or local government reports. The enacted legislation did differ in several respects from the reported bills, but the subsequent legislative record contains no reference to the inclusion of state or local government sources. See, e. g., 132 Cong. Rec. 20535-20537 (statement of Sen. Grassley); id,., at 29321-29322 (statements of Reps. Glickman and Berman).

 Of course, 31 U. S. C. § 3730(e)(4)(A) (2006 ed.) speaks of “public disclosure,” not notice to the Government. But the requirement of a “public” disclosure countenances notice, both to the public and otherwise. Indeed, a number of lower courts look to whether the Federal Government is “on notice” of alleged fraud before concluding that a particular source is a “public disclosure of allegations or transactions” under § 3730(e)(4)(A). See, e. g., United States ex rel. Poteet v. Medtronic, Inc., 552 F. 3d 503, 512 (CA6 2009) (“[A] public disclosure reveals fraud if the information is sufficient to put the government on notice of the likelihood of related fraudulent activity” (internal quotation marks omitted)); United States v. Alcan Elec. & Eng., Inc., 197 F. 3d 1014, 1020 (CA9 1999) (similar); United States ex rel. Fine v. Sandia Corp., 70 F. 3d 568, 572 (CA10 1995) (similar).

 The Court observes that federal law requires some recipients of federal funds to conduct audits, ante, at 299, n. 18, and amici States point to the auditing and reporting requirements of the Single Audit Act of 1984, Brief for Commonwealth of Pennsylvania et al. as Amici Curiae 7-10 *313 (hereinafter States Brief). But neither the Court nor the amici rebut the Solicitor General’s pragmatic observation that “the vague and summary nature of many of those reports . . . does not. .. alert the federal government of fraud.” Brief for United States as Amicus Curiae 31.

 The majority notes in passing several policy arguments advanced by petitioners and their amici. Ante, at 301, n. 19. None merits much weight. Petitioners are concerned about a race to the courthouse, in which parasitic relators will capitalize on information released in a state or local government report to the disadvantage of a slow-moving insider. Brief for Petitioners 31. But the FCA’s first-to-file provision, 31 U. S. C. § 3730(b)(5), reflects Congress’ explicit policy choice to encourage prompt filing and, in turn, prompt recovery of defrauded funds by the United States. Amici States are concerned that relators may interfere with ongoing state and local government investigations by “trolling state records and reports” for evidence of fraud. States Brief 11. But some state freedom-of-information laws exempt materials related to ongoing civil investigations. See, e. g., Kan. Stat. Ann. §45-221(a)(ll) (2008 Cum. Supp.); Pa. Stat. Ann., Tit. 65, §67.708(b)(17) (Purdon Supp. 2009). In any event, the FCA contains no provision giving state or local governments a privileged position as qui tam relators or, with respect to local governments, defendants.